Tom FENDER, Plaintiff,

v.

CITY OF OREGON CITY, a municipal corporation, and David Spear, individually and in his official capacity as Mayor of Oregon City, Defendants.

No. CV 91–121–PA.

United States District Court,
D. Oregon.

Jan. 21, 1993.

Richard C. Busse, Portland, OR, for plaintiff.

Douglas R. Andres, Karen M. Vickers, Bullivant, Houser, Bailey, Pendergrass & Hoffman, Portland, OR, for defendants.

## AMENDED OPINION

PANNER, District Judge.

Plaintiff Tom Fender brought this action against defendants Oregon City and its former mayor, David Spear, alleging defendants had (1) violated his First Amendment

rights by constructively terminating him from his position as city manager in retaliation for statements plaintiff made to a reporter that were subsequently published in the local newspapers, and (2) defamed him by virtue of comments Mayor Spear made to a reporter that were likewise published in the local newspapers.[1]

The jury found defendant Oregon City liable for violating plaintiff's civil rights and awarded plaintiff $20,000 in damages. Defendant Spear was found not personally liable for violating plaintiff's civil rights. The jury found defendants Spear and Oregon City liable for defamation and awarded plaintiff $13,500. The jury also found defendant Spear was not privileged to make the alleged defamatory statement in his capacity as mayor of Oregon City.

Defendants renew their motion for judgment as a matter of law. If the motion is denied, defendants seek a new trial on the civil rights claim. I grant defendant's motion for judgment as a matter of law and conditionally deny the motion for a new trial. Each party will pay its own attorney fees. Costs to the prevailing party.

### STANDARDS

A renewed motion for judgment as a matter of law must be granted if the evidence, considered as a whole and viewed in the light most favorable to the nonmoving party, reasonably can support only a verdict for the moving party. *Gillette v. Delmore*, 979 F.2d 1342 (9th Cir.1992). Judgment as a matter of law is inappropriate where there is substantial evidence supporting a verdict in favor of the nonmoving party. *Id.* Substantial evidence is such relevant evidence as a reasonable mind would accept as adequate to support a conclusion. *Id.*

### DEFAMATION CLAIM

Mayor Spear was asked by a reporter to compare the performance of the present city manager (Charles Leeson) with that of the prior city manager (Tom Fender).

Spear replied: "We're quite pleased with Charlie. He's been doing the job that we asked Tom Fender to do, but didn't do." Plaintiff's Exhibit 13. The jury found both Spear and Oregon City liable for defamation. Defendants challenge the jury verdict on three grounds: (1) the statement was not defamatory as a matter of law; (2) plaintiff did not prove Spear made the statement with knowledge of its falsity, or with reckless disregard for the truth; and (3) Spear is absolutely immune from suit because the statement was made in the course of his duties as mayor.

**1. *Defamatory:*** Whether a statement is capable of having a defamatory meaning is a question of law for the court. *Beecher v. Montgomery Ward & Co.*, 267 Or. 496, 500, 517 P.2d 667 (1973). A statement is capable of a defamatory meaning if it would subject a person to hatred, contempt or ridicule, or tend to diminish the esteem, respect, goodwill, or confidence in which one is held, or to excite adverse, derogatory or unpleasant feelings or opinions against one. *Farnsworth v. Hyde*, 266 Or. 236, 238, 512 P.2d 1003 (1973).

Arguably Spear's statement falls within that broad definition. The statement could be construed as suggesting plaintiff was insubordinate, incompetent, or otherwise not up to the job. *See Bock v. Zittenfield*, 66 Or.App. 97, 102, 672 P.2d 1237 (1983), *rev. denied*, 296 Or. 486, 677 P.2d 702 (1984) (statement that reporter was fired because "[he] simply didn't perform his job as far as his responsibility for covering the news is concerned" was capable of being defamatory). While that is not the only possible way of construing Spear's statement, the jury found that a recipient would construe it in that fashion. I cannot say this conclusion was unreasonable as a matter of law.

**2. *Malice:*** To prevail, plaintiff must prove Mayor Spear knew the statement was false, or "entertained serious

---

1. I earlier dismissed additional claims alleging defendants violated Oregon's public meetings law, deprived plaintiff of a property interest in his employment without due process of law, and impaired plaintiff's liberty interest. Order of April 17, 1992.

doubts" as to its truth. *See St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968) (describing malice requirement for public figure). Plaintiff did not come close to meeting that burden.

■ A statement cannot be deemed "false" unless the statement or its connotations are sufficiently factual to be susceptible of being proved true or false. *See Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 3, 110 S.Ct. 2695, 2707, 111 L.Ed.2d 1 (1990). Ordinarily I would have serious doubts whether it is possible to prove a city manager "did the job" or not, given the highly subjective nature of such an assessment. Here, the City Commission ("Commission") conducted a detailed performance evaluation of plaintiff only weeks before his resignation, so the statement is somewhat more objectively verifiable.

Plaintiff relied heavily on that evaluation, but it does not support his position. Plaintiff trumpeted the fact that the Commission had rated him "Acceptable," but that would seem tantamount to a "Gentleman's C" on the evaluation scale used. The evaluation covered 28 areas. In 15 of those areas, not a single commissioner rated Fender even "good," let alone "excellent". Defendants' Exhibit 111. Fender received grades of "good" or "excellent" from at least two commissioners in just 7 of the 28 areas evaluated. *Id.* Conversely, he received grades of "poor" or "unacceptable" from at least two commissioners in 7 of the 28 areas evaluated. *Id.* Fender received his worst marks in critical areas such as "sensitivity," "communications," and "honesty." *Id.*

Although plaintiff contends the evaluation was skewed by the low marks awarded by Commissioner Van Orman, none of the commissioners consistently gave Fender good marks, with the possible exception of Commissioner Powell. *See* Defendants' Exhibit 115 at 15. Indeed, no commissioner other than Powell individually rated Fender "good" or "excellent" in more than 4 of the 28 areas. *Id.* The evaluation would have been worse had not Commissioner Smith resigned at the previous meeting to protest the Commission's refusal to immediately fire Fender. *See generally* Defendants' Exhibit 114.

Moreover, many events occurred between the time the performance evaluation was conducted and the date Spear made the statement. The commissioners had an opportunity to observe how Fender responded (or didn't respond) to their evaluation, and to the list of changes demanded by the commission. *See* Plaintiff's Exhibit 4 at 24. It is also noteworthy that two commissioners who declined to fire Fender in November reversed course and sought to terminate him in February. One of those commissioners was Mayor Spear. Finally, Spear had the opportunity to observe the performance of the new city manager and compare his performance to that of the plaintiff.

Fender did a good job in certain areas, as Commissioner Powell's memo of July 10, 1989 demonstrated. *See* Plaintiff's Exhibit 2. Mayor Spear also testified that plaintiff had accomplished a number of tasks the Commission had assigned. However the "job" of city manager is more than just bricks, mortar, and tax bases—it involves communication, employee and citizen relations, and trust. There was persuasive evidence that relations between Fender and the Commission had been shaky almost from the start of his tenure as city manager. *See, e.g.,* Defendants' Exhibit 102. The Commission seriously considered terminating Fender at its executive session of November 17, 1989, and ultimately agreed to give him a deadline to improve his performance or face termination. *See* Defendants' Exhibit 114 at 12. There was also testimony that Fender clashed with some of the local citizenry, including former mayor Ed Allick. Commissioner Smith testified that he resigned after the Commission insisted on evaluating Fender instead of firing him outright. Commissioner Van Orman had also set her sights on ousting Fender. Even Commissioner Powell, Fender's strongest defender, conceded that Fender's style of governing did not mesh well with the Commission. Plaintiff's Exhibit 2.

558

■ In determining whether a statement is capable of being defamatory, we construe the statement in accordance with how the recipient would understand it. *Glenn v. Esco Corp.*, 268 Or. 278, 520 P.2d 443 (1974). With respect to malice, the inquiry focuses upon the subjective understanding of the speaker. *St. Amant*, 390 U.S. at 731, 88 S.Ct. at 1325. Mayor Spear essentially said that the commissioners were dissatisfied with Fender's performance as city manager, and preferred the way Leeson was handling the job. I think that is a reasonably accurate statement. In any event, plaintiff did not prove Spear's statement was false, let alone that he knew it was false. The great weight of evidence showed that Fender did not always perform his duties in the manner in which the Commission would have liked, especially in the areas of inter-personal relations and fiscal restraint.

Plaintiff should not take offense at the assertion that he "did not do the job" the Commission wanted him to do. Fender may have been right about how to run the city and the Commission wrong. That is not the issue here. Contrary to the arguments of plaintiff's counsel, this case is not a referendum on whether Fender is a good city manager, or the manner in which Oregon City treats (or mistreats) its city managers. Rather, the question is whether a reasonable jury could find from the evidence in the record that Mayor Spear knew the statement was false, or "entertained serious doubts" as to its truth. *St. Amant*, 390 U.S. at 731, 88 S.Ct. at 1325. The record does not permit such a finding. Accordingly, judgment must be entered for defendants on this claim.

■ 3. *Absolute Immunity:* Under Oregon law executive officers have an absolute privilege to publish defamatory material in the course of performing their executive duties. *Schroeder v. Poage*, 75 Or.App. 671, 675, 707 P.2d 1240, *rev. denied*, 300 Or. 451, 712 P.2d 110 (1985); *Shearer v. Lambert*, 274 Or. 449, 547 P.2d 98 (1976). The jury found Mayor Spear was not entitled to immunity because he was not authorized to make the statement

in question as part of his mayoral duties. There is no evidence in the record to support the jury's conclusion. Plaintiff argued that the Mayor was not supposed to discuss personnel matters in public, but cited no law to that effect. There was nothing confidential about the information Spear disclosed to the press. The saga of Tom Fender, and the Commission's dissatisfaction with his performance, had been widely reported in the press already. *See, e.g.*, Defendants' Exhibits 127–30. Nor does it appear Spear was voicing any personal vendetta against Fender. He was asked to compare the performance of the new manager with that of the prior manager, and he did. That was certainly within the perimeter of his job as mayor. The Commission had terminated Fender on grounds they were dissatisfied with his performance, and the public was entitled to know how the new manager (Leeson) compared to the prior one in the eyes of the mayor.

Plaintiff also contends Mayor Spear was not authorized to make defamatory statements. That cannot be the appropriate standard. It makes no sense to grant the mayor immunity from defamation claims, but then withdraw that immunity if the holder makes a defamatory statement. Such an immunity would be purely illusory. Rather, the statement must be considered in terms of its overall subject matter, within the larger context of the mayor's duties.

■ Finally, plaintiff argues that Mayor Spear was not *required* by law or by direction of his superiors to make the statement in question. However, that is not controlling in the case of an official of policy-making rank. The same considerations which underlie the recognition of the privilege as to acts done in connection with a mandatory duty apply with equal force to discretionary acts at those levels of government where the concept of duty encompasses the sound exercise of discretionary authority. *Barr v. Matteo*, 360 U.S. 564, 575, 79 S.Ct. 1335, 1341, 3 L.Ed.2d 1434 (1959)(plurality opinion). Accordingly, judgment must be entered for defendant.

## FIRST AMENDMENT CLAIM

The jury found Oregon City violated plaintiff's First Amendment rights. Defendant challenges the verdict on four grounds: (1) plaintiff was not "constructively discharged," (2) plaintiff was not terminated in retaliation for exercising his First Amendment rights, (3) the retaliation did not occur pursuant to an official "custom, policy or usage"; and (4) the subject speech was not protected by the First Amendment.

■ 1. *Constructive Discharge:* The jury did not err in finding Fender was constructively discharged. Plaintiff was told in no uncertain terms that in a few hours the Commission would be voting on a motion to terminate him, and a majority of the commissioners would be supporting that motion. The message was personally conveyed by Mayor Spear and Commissioner Fowler, both of whom had opposed terminating Fender as recently as November, 1989. When coupled with the vote of Commissioner Van Orman, who was already on record in favor of ousting Fender, the motion was assured of passage. Fender's resignation was a mere formality. *See Sheets v. Knight,* 308 Or. 220, 227, 779 P.2d 1000 (1989).

2. *Catalyst for Termination:* To prevail, plaintiff must prove the protected speech was a substantial or motivating factor in defendant's decision to terminate his employment. *Mt. Healthy City School Dist. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977). Defendants may still prevail if they demonstrate by a preponderance of the evidence that the same action would have been taken even in the absence of plaintiff's protected speech. *Id.* I find there was sufficient evidence from which a reasonable jury could conclude that Fender's statement to the press was a substantial factor in the Commission's decision to fire Fender, and make his "resignation" effective immediately, and that defendants would not have taken the same action in the absence of plaintiff's protected speech.

Although Fender had been on the ropes during most of his tenure as city manager, I cannot say that the "handwriting was on the wall," as defendants contend. Defendants' Memorandum at 4. Fender had recently survived a move to oust him, and one of his principal antagonists had resigned from the Commission. In theory, only Commissioner Van Orman now favored termination. Suddenly, both Mayor Spear and Commissioner Fowler changed their positions and urged Fender's immediate ouster. A jury could reasonably conclude that the controversy surrounding the article helped precipitate this turn of events. Spear and Fowler did not provide a convincing explanation for their actions. In addition, there was evidence the article detailing Fender's proposed budget cuts led to citizen protests that urged Fender's immediate ouster and threatened to recall any commissioner who opposed the motion. *See* Defendants' Exhibit 121. An article detailing the threat to recall the Commission unless they fired Fender appeared on the front page of the Enterprise Courier on February 6, 1990. *Id.* Spear and Fowler's visit to Fender took place the following morning. Although the commissioners denied they were influenced by such pressure, the jurors were entitled to rely on their own experience and common sense in evaluating that testimony. Finally, there was testimony that at least some of the commissioners were angered by both the substance and timing of the article. They had earlier told him to leave the elevator operators alone and he had defied their instructions. Commissioner Van Orman also testified she was upset at first learning of the proposal in the newspapers. The evidence, viewed in the light most favorable to plaintiff, was sufficient to support the jury's verdict on this issue.

3. *Monell:* Defendant correctly notes Oregon City cannot be held liable on a *respondeat superior* theory. Defendant also notes there was no formal delegation of power to Mayor Spear to fire Fender. Finally, defendant denies there was any policy or custom of violating First Amendment rights. Therefore, defendant contends there was no basis for finding Oregon City liable.

The flaw in defendant's argument is that this is not a case where a low-level employee took some action and the plaintiff is trying to hold the City liable. Rather, it is the City itself, acting through its Commission, that is accused of violating plaintiff's constitutional rights by making a deliberate, affirmative choice to follow a course of action selected from among various alternatives. That is sufficient to precipitate liability under § 1983. *See Pembaur v. City of Cincinnati,* 475 U.S. 469, 480–81, 106 S.Ct. 1292, 1299, 89 L.Ed.2d 452 (1986) (plurality opinion) (municipality may be held liable for acts which it has officially sanctioned or ordered). *Accord, City of St. Louis v. Praprotnik,* 485 U.S. 112, 129–30, 108 S.Ct. 915, 927, 99 L.Ed.2d 107 (1988) (plurality opinion).

The essence of plaintiff's constructive discharge theory is that Fender resigned in the face of imminent action to be taken by the Commission, not by Spear personally. Only the Commission could fire Fender. Accordingly, once the jury found Fender had been constructively discharged by the Commission, there was no need for a *Monell* instruction. The jury's verdict finding Spear personally not liable for firing Fender is entirely consistent with a finding that the Commission itself directly violated plaintiff's rights.

4. *Protected Speech:* Defendant's motion turns on the question of whether the speech in question was protected. This is a question of law that I reserved during the trial. I decide the speech is not protected.

The doctrine of First Amendment rights for public employees developed during the red-baiting era of the 1950's and 1960's, in response to laws which sought to condition public employment upon adherence to selected political views. *See, e.g., Wieman v. Updegraff,* 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952) (state could not condition employment upon oath denying past affiliation with Communist party). Gradually this evolved into a general rule that public employees retained the right to associate and speak freely on matters of public concern, consistent with the interests of the state, as an employer, in promoting the efficiency of the public services it performs through its employees. *See Pickering v. Board of Ed.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968).

▪ Application of this balancing test entails a factual inquiry into such matters as whether the speech (i) impairs discipline or control by superiors, (ii) disrupts co-worker relations, (iii) erodes a close working relationship premised on personal loyalty and confidentiality, (iv) interferes with the speaker's performance of his duties, or (v) obstructs the routine operation of the office. *Hyland v. Wonder,* 972 F.2d 1129, 1139 (9th Cir.1992).

The classic situation protected by the doctrine is a low-level public employee who expresses *personal* views on a matter of public concern that does not directly relate to the employee's job. *See, e.g., Rankin v. McPherson,* 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987) (clerical employee privately expressing disappointment that the attempt to assassinate President Reagan failed). The Court has also upheld an employee's right to take part in public debate over controversies involving his own employer, where the employee was speaking as an individual and was not in a policy-making role, and the statements were "in no way directed towards any person with whom appellant would normally be in contact in the course of his daily work." *See, e.g., Pickering,* 391 U.S. at 569–70, 88 S.Ct. at 1735 (teacher who wrote a letter to the editor criticizing the Board of Education's allocation of school funds).

▪ By contrast, Fender's statements were made in the course of his employment. Budgetary decisions are a matter of public concern, but Fender was not stating his personal views on the subject but rather his views as city manager. Accordingly, his speech does not come under the umbrella of *Pickering* or *Rankin.*

▪ Nor do I see any other basis for affording First Amendment protection to his speech. There is no *per se* exemption from First Amendment protection for communications made in the course of an employee's official duties. *See Koch v. City*

*of Hutchinson,* 847 F.2d 1436, 1442 (10th Cir.), *cert. denied,* 488 U.S. 909, 109 S.Ct. 262, 102 L.Ed.2d 250 (1988). Nonetheless, that fact is a significant factor in the balancing process which will frequently lead to a finding that the speech is unprotected because the employer's interests are ordinarily directly implicated when the speech is made in the course of the employee's official duties. *Id.*

The First Amendment does not, under ordinary circumstances, protect an at-will high-level policy-making employee from being fired because of job-related opinions and ideas he expresses as part of his employment. Government does not operate on a consensus basis. Policy-making employees are not free, in the course of their employment, to openly pursue goals that are contrary to those established by the governing body. *See Wheaton v. Webb–Petett,* 931 F.2d 613, 618 (9th Cir. 1991)(branch manager had no constitutional right to resist policies advocated by his department head).

No one would deny that the President can fire a cabinet official who disagrees with the President's policies. The same is true of the relationship between a city commission and its city manager. Absent state law to the contrary, the Oregon City Commission is entitled to the services of a city manager who dances to the same music as the Commission. If the Commission disagrees with the policies advocated by the manager, the Commission has every right to replace him. Such considerations are at the very heart of the Supreme Court's balancing test (e.g. impairment of discipline, or of close working relationships premised on personal loyalty and confidentiality). *See Pickering,* 391 U.S. at 570, 88 S.Ct. at 1735. Perhaps the public would be better served by allowing the manager to speak freely when he disagrees with the policies being pursued by the Commission. That is a matter for the legislature, not the courts.

There are a few circumstances where statements made in the course of employment have been found sufficiently meritorious that the scales tip in favor of protection under the First Amendment. Typical-

ly that occurs when the employee is engaged in "whistle-blowing." *See, e.g., Givhan v. Western Line Consolidated School Dist.,* 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979) (employee made private communications to employer concerning its allegedly racially discriminatory policies); *Roth v. Veteran's Admin.,* 856 F.2d 1401, 1405 (9th Cir.1988) (private statements to superiors disclosing waste, mismanagement, incompetence, and unethical conduct at hospital); *Hyland,* 972 F.2d at 1137 (memo sent to judges disclosing abuses, inefficiency, threats to public safety, incompetence, and potential civil rights violations at juvenile hall).

Fender does not seriously contend he was acting as a whistle-blower. Rather, he was simply advocating his proposed budget cuts. Had Fender made this proposal at a Commission meeting, the Commission could have fired him on the spot, and there would be no claim of a First Amendment violation. The same speech, when published in the newspapers, does not magically acquire protected status.

## NEW TRIAL

Defendant moves, in the alternative, for a new trial on grounds I erred by not giving a *Monell* instruction, and not properly defining the concept of "constructive discharge." Fed.R.Civ.P. 50(c) requires me to conditionally rule on the motion for a new trial in case my ruling on the JNOV motion is reversed.

I conditionally deny the motion for a new trial. The term "constructive discharge" was properly defined, and there was no need to give a *Monell* instruction under the circumstances of this case. If the court of appeals affirms my rulings on the motion for JNOV, judgment should be entered for defendants, and vice versa. There is little to be gained by another trial.

## CONCLUSION

I grant defendants' renewed motion (80–1) for judgment as a matter of law. Defendants' alternative motion (80–2) for a new trial is conditionally denied. Each party

will pay its own attorney fees. Costs to the prevailing party.