Deborah I. VOLBERG, Plaintiff,

v.

George E. PATAKI, Individually and as Governor of the State of New York, Constance Kellog–Barrella, Individually and as Deputy Commissioner of the New York State Department of Environmental Conservation, Frank Bifera, Individually and as Acting General Counsel to the Department of Environmental Conservation, Michael Finnegan, Individually and in His Capacity as Counsel to the Governor, and Gavin Donohue, Individually and in His Capacity as Special Assistant to the Governor, Defendants.

No. 95–CV–1095.

United States District Court,
N.D. New York.

Feb. 28, 1996.

Lovett, Gould Law Firm, White Plains, NY (Jonathan Lovett, of counsel), for plaintiff.

Office of the Attorney General, Department of Law, Albany, NY (Darren O'Connor, Asst. Atty. Gen., of counsel), for defendants.

## MEMORANDUM–DECISION and ORDER

McAVOY, Chief Judge.

## I. INTRODUCTION

**Plaintiff Deborah Volberg** commenced this action by filing a complaint on February 27, 1995, in the Southern District of New York. On July 26, 1995, Southern District Judge Barrington Parker granted defendants' motion to transfer venue to this Court. Finally, on August 31, 1995, plaintiff filed an amended complaint wherein she alleges violations of Title VII, 42 U.S.C. § 2000e–3, the First Amendment pursuant to 42 U.S.C. § 1983, the New York State Constitution, and New York statutory law by **defendants George Pataki, Constance Kellogg–Barrella, Frank Bifera, Michael Finnegan, and Gavin Donohue.** Plaintiff generally alleges that she was terminated as Acting Deputy Commissioner and General Counsel of the New York State Department of Environmental Conservation ("DEC") for improper retaliatory reasons. Defendants now move for judgment on the pleadings and for summary judgment.

## II. BACKGROUND

DEC hired plaintiff in February, 1993, as Deputy Counsel and Director of Legal Affairs. In Early 1995, the DEC Commissioner appointed her as Acting Deputy Commissioner and General Counsel. Both these positions are classified as "exempt" such that employees in the positions do not obtain "tenure" and are not protected from termination by the Civil Service Law. *See* N.Y.Civ.Serv.Law §§ 41, 75. Furthermore, both these positions have been designated as "policy-making" by the Public Officers

Law, so plaintiff was required to file annual financial disclosure forms with the New York State Ethics Commission and risked termination if the Governorship were to change hands. N.Y.Pub.Off.Law § 73–a. Finally, both jobs held by plaintiff were relatively high-paying; she began at an annual salary of $72,473 and was making $80,188 after her promotion.

After the inauguration of defendant Pataki as Governor in January, 1995, plaintiff was directed by defendants to identify seven competitive-class [1] attorney positions at DEC to be eliminated. Plaintiff contends that, at least part of the basis for this instruction, defendants entered into a scheme whereby they would fire employees who were registered members of the Democratic Party or who had otherwise opposed the election of Governor Pataki. Plaintiff also alleges that she opposed the reduction in staff on the grounds that political firings were generally improper, and that the layoffs would weaken DEC's effectiveness and would expose DEC to liability under Titles VI and VII.

In order to communicate her misgivings, plaintiff sent a memo to her supervisors on or about February 22, 1995, in regard to the plan to eliminate the seven competitive attorney positions. DEC recently had hired a group of minority lawyers, and plaintiff expressed her opinion that the effect of targeting competitive positions would be the termination of three of the five remaining minority lawyers. In plaintiff's view, such action would have a disparate impact on those lawyers and could lead to legal action against DEC. Thus she proposed two alternative plans in her memo for carrying out the layoffs that would lead to the loss of only two, rather than three, of the minority lawyers. Finally, plaintiff stated that "in my best professional judgment," such firings "would cripple [DEC's] ability to provide adequate services." (Pl.'s Mem.Opp.Dism. At 6.)

---

**1.** The "competitive class" of state workers "shall include all positions for which it is practicable to determine the merit and fitness of applicants by competitive examination...." N.Y.Civ.Serv. Law § 44. Employees in "competitive class" positions "shall not be removed or otherwise subjected to any disciplinary penalty ... except for incompetency or misconduct shown after a hearing...." N.Y.Civ.Serv.Law § 75. The positions of such employees may be eliminated, however. *See* N.Y.Civ.Serv.Law § 80.

Plaintiff was fired soon after defendants became aware of her memo. Her last day on the job was March 17, 1995. Plaintiff brings four federal causes of action in her Complaint related to her firing: (1) because defendants discharged her in retaliation for her memo concerning, *inter alia*, disparate impact discrimination, they violated her rights under Title VII, 42 U.S.C. § 2000e–3; (2) defendants violated her First Amendment right of free speech; (3) defendants violated her First Amendment right of association by firing her because she is a Democrat; and (4) defendants violated her First Amendment right to petition for redress of grievances. Plaintiff also seeks relief for the same alleged misconduct in four other causes of action pursuant to analogous provisions of New York law.

Defendants now move for dismissal pursuant to Fed.R.Civ.P. 12(c) on plaintiff's claims related to Title VII, free speech, and the right to petition, and for summary judgment pursuant to Fed.R.Civ.P. 56 on plaintiff's right of association claim. Defendants generally assert that (1) plaintiff's action in writing the memo was not protected activity under Title VII; (2) the memo itself was not protected speech or petitioning under the First Amendment; (3) plaintiff was a "confidential policy-maker" who consequently was not protected against politically motivated discharges; and (4) defendants are qualifiedly immune from liability on plaintiff's First Amendment claims. The following constitutes the Court's adjudication of the issues raised.

## III. DISCUSSION

### A. DEFENDANTS' SUMMARY JUDGMENT MOTION

In her Memorandum of Law opposing defendants' motions, plaintiff withdraws her Third Cause of Action, under which she claimed that defendants' conduct violated her First Amendment right of association. Plaintiff emphasizes that she is not withdrawing any of her other claims. As a result, plaintiff's Third Cause of Action may be dismissed and defendants' summary judgment motion on that count pursuant to Fed. R.Civ.P. 56 may be denied as moot. Defen-

dant's motions for dismissal of the other counts pursuant to Fed.R.Civ.P. 12(c) still remain to be addressed, however.

### B. DEFENDANT'S DISMISSAL MOTIONS

#### 1. Legal Standard

■ In deciding a motion for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c), a court should apply the same standard as that applicable to a Fed.R.Civ.P. 12(b)(6) motion to dismiss for failure to state a claim. *Sheppard v. Beerman*, 18 F.3d 147, 150 (2d Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 73, 130 L.Ed.2d 28 (1994); *Ad–Hoc Comm. Of Baruch Black and Hispanic Alumni Ass'n v. Bernard M. Baruch College*, 835 F.2d 980, 982 (2d Cir.1987). Under that test,

> a court must accept the allegations contained in the complaint as true, and draw all reasonable inferences in favor of the non-movant; it should not dismiss the complaint "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim [that] would entitle him to relief."

*Sheppard*, 18 F.3d at 150 (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)). Furthermore, this standard is applied with particular strictness where, as here, the plaintiff complains of civil rights violations. *Branum v. Clark*, 927 F.2d 698, 705 (2d Cir.1991).

#### 2. Plaintiff's Title VII Claim

■ Section 704(a) of Title VII provides, in pertinent part, that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because [the employee] has opposed any practice made an unlawful employment practice by this subchapter...." 42 U.S.C. § 2000e–3(a). The objective of this subsection "is obviously to forbid an employer from retaliating against an employee because of the latter's opposition to an unlawful employment practice." *Manoharan v. Columbia Univ. College of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir.1988). Section 703(a) of Title VII defines "unlawful employment practice" in this way:

It shall be an unlawful employment practice for an employer ... to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin....

42 U.S.C. § 2000e–2(a)(1).

■ The *McDonnell Douglas* framework, established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), governs the order of proof in retaliation cases. *See Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 46 (2d Cir.1980). Under this framework, an employee plaintiff must first establish his *prima facie* case. *Id.* Thus the employee must show "that [he or she] was engaged in protected activity; that the employer was aware of that activity; that the employee suffered adverse employment decisions; and that there was a causal connection between the protected activity and the adverse employment action." *Manoharan*, 842 F.2d at 593. If a plaintiff is successful in making out a *prima facie* case, the burden of production shifts to the defendant so that the defendant has an opportunity to articulate some legitimate, non-retaliatory reason for the adverse employment action. *Grant*, 622 F.2d at 46.

Contrary to plaintiff's stated belief, defendants clearly do not concede that she has satisfied the four-point test of *Manoharan* and established a *prima facie* case. Although defendants do appear to concede that they were aware of plaintiff's activity, that she suffered adverse employment decisions, and that a causal connection exists, they strenuously challenge the proposition that plaintiff's activity was protected by Title VII. Because plaintiff's theory that disparate impact discrimination would result from the layoffs was so meritless, defendants argue,

plaintiff was not shielded when she wrote her infamous memo. The Court consequently must consider this issue to determine whether plaintiff has established a *prima facie* case.

■ It is well-settled that a finding of unlawful retaliation generally does not depend on the merits of the underlying discrimination complaint. *Davis v. State Univ. of New York*, 802 F.2d 638, 642 (2d Cir.1986); *James v. Runyon*, 843 F.Supp. 816, 825 (N.D.N.Y.1994), *aff'd*, 47 F.3d 1158 (2d Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 126, 133 L.Ed.2d 75 (1995). However, the plaintiff in such an action "must demonstrate a 'good faith, reasonable belief that the underlying challenged actions of the employer violated the law.'" *Manoharan*, 842 F.2d at 593 (quoting *Abel v. Bonfanti*, 625 F.Supp. 263, 267 (S.D.N.Y.1985)). When analyzing plaintiff's belief in this case, the Court must take into account the fact that she was acting not as a typical lay employee but rather as DEC's General Counsel. In other words, the Court will infer an absence of good faith on plaintiff's part if a reasonable *attorney* in plaintiff's position would not have believed that defendants' proposed downsizing violated the law.

■ Defendants make much of the fact that plaintiff has not submitted detailed statistical analyses to support her allegations of disparate impact. Even if she had, they also argue that because the relevant universe of employees is relatively small, such analysis would be meaningless, making it impossible for the employees to prove disparate impact discrimination with the requisite certainty. These arguments are not altogether convincing. Were it necessary, the Court conceivably could find that plaintiff had a good faith, reasonable belief that her activity was protected by Title VII notwithstanding the absence of detailed statistical analyses and the small employee group.[2]

---

**2.** First, a plaintiff in a disparate impact case must only offer statistical evidence of a kind and degree sufficient to show that the practice in question has a greater negative impact on a minority group. The Supreme Court has dictated that no particular mathematical formula must be implemented and satisfied. *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 994–95, 108

S.Ct. 2777, 2788–89, 101 L.Ed.2d 827 (1988). Instead, "[c]ases must be evaluated on their own terms." *Council 31, American Fed'n of State, County, & Mun. Employees v. Ward*, 978 F.2d 373, 379 (7th Cir.1992) (citing *Watson* ). Second, this is not a disparate impact case. It is a *retaliation case,* and thus plaintiff does not have to present the Court with evidence that would

█ It is not necessary, however, because defendants are convincing when they argue that plaintiff's memo was unreasonable "because Title VII expressly provides that an employer is not liable for the discriminatory effects of layoffs based on seniority." (Defs' Reply Mem.Supp.Dism. at 3.) Section 703(h) of Title VII provides, in pertinent part, that

it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system ... provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin. . . .

42 U.S.C. § 2000e–2(h). This section means that a showing of disparate impact is "insufficient to invalidate a [bona fide] seniority system." *Pullman–Standard v. Swint,* 456 U.S. 273, 277, 102 S.Ct. 1781, 1784, 72 L.Ed.2d 66 (1982).

Therefore, unless a seniority system was adopted with the intent to discriminate, its use cannot be an unlawful employment practice under Title VII's disparate impact theory even if it has some discriminatory consequences. *See Trans World Airlines, Inc. v. Hardison,* 432 U.S. 63, 82, 97 S.Ct. 2264, 2275–76, 53 L.Ed.2d 113 (1977). Defendants argue in this case that the New York Civil Service Law "last-hired, first-fired" seniority provisions determined which DEC employees would be affected by the downsizing of their department. *See* N.Y.Civ.Serv. Law § 80.[3] Because this aspect of the Civil Service Law represents a bona fide seniority system and there is no evidence that the statute was adopted with intent to discriminate, defendants contend that plaintiff could not possibly have written her memo with a good faith, reasonable belief that it was protected by Title VII.

█ The Court agrees with defendants on this issue, because it difficult to conceive of a better example of a seniority system than the Civil Service Law's "last-hired, first-fired" rule. According to the Supreme Court, "the principal feature of any and every 'seniority system' is that preferential treatment is dispensed on the basis of some measure of time served in employment." *California Brewers Ass'n v. Bryant,* 444 U.S. 598, 606, 100 S.Ct. 814, 819, 63 L.Ed.2d 55 (1980). Beyond that characteristic, every "bona fide seniority system" must meet certain requirements:

[E]very seniority system must include rules that delineate how and when the seniority time clock begins ticking, as well as rules that specify how and when a particular person's seniority may be forfeited. Every seniority system must also have rules that define which passages of time "count" toward the accrual of seniority and which will not. Every seniority system must, moreover, contain rules that particularize the types of employment conditions that will be governed or influenced by seniority, and those that will not. Rules that serve these necessary purposes do not fall outside [Section] 703(h) simply because they do not, in and of themselves, operate on the basis of some factor involving the passage of time.

*Id.* The Civil Service system appears to include all these rules, and plaintiff has not argued to the contrary.

█ Defendants are correct that the Second Circuit posed and answered this question quite some time ago: "[D]oes a facially neutral excessing plan, which operates on the concept of 'last hired—first fired,' discriminate against minorities who are disproportionately affected? ... [T]he answer to this question must be 'no.'" *Chance v. Board of*

prove a Title VII violation. She only need demonstrate that it was reasonably possible that Title VII liability would result from defendants' downsizing plan.

**3.** Section 80 dictates that
Where, because of economy, consolidation, or abolition of functions, curtailment of activities or otherwise, positions in the competitive class are abolished ... suspension or demotion, as

the case may be, among incumbents holding the same or similar positions shall be made in inverse order of original appointment on a permanent basis in the classified service in the service of the governmental jurisdiction in which such abolition or reduction of positions occurs. . . .
N.Y.Civ.Serv.La. § 80(1).

*Examiners,* 534 F.2d 993, 997 (2d Cir.1976) (holding that "last-hired, first-fired" seniority provisions are bona fide seniority systems under Title VII). In sum, Title VII was not intended to invalidate legitimate seniority systems and force employers to fire more senior, nonminority employees out of a concern for some vague notion of affirmative action or "diversity". 42 U.S.C. § 2000e–2(j) (entitled "Preferential treatment not to be granted on account of existing number or percentage imbalance"). *See also Manoharan,* 842 F.2d at 594 (finding that "affirmative action in employment practices is not required by Title VII").

 Because plaintiff was General Counsel to DEC and personally determined who would have to be terminated under defendants' downsizing plan, she should have been keenly aware that Section 703(h) of Title VII applied to this case. *See* 42 U.S.C. § 2000e–2(h). The Court consequently can infer that plaintiff, in writing her memo to defendants, could not have had "a good faith, reasonable belief that the underlying challenged actions of the employer violated the law." *Manoharan,* 842 F.2d at 593. Even assuming plaintiff's allegations are true, she was not engaged in protected activity when she wrote the memo and has failed to establish a *prima facie* case of retaliatory discharge.

### 3. Plaintiff's First Amendment Claims

 State officials may not discharge an employee for reasons that infringe on that employee's constitutionally protected interest in freedom of speech. *See Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972). In order for plaintiff to withstand defendants' motion to dismiss on the pleadings, she first must establish that her speech dealt with a matter of public concern and that the speech was a motivating factor in her discharge. *Frank v. Relin,* 1 F.3d 1317, 1330 (2d Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 604, 126 L.Ed.2d 569 (1993). Here, plaintiff's speech—in the form of her memo to defendants—clearly was a motivating factor in her discharge. Defendants admit, for example, that part of their justification for firing plaintiff was that her memo "reveals that she cannot be relied upon to deliver sound legal advice and to support management policy." (Defs' Reply Mem.Supp.Dism. At 9.) Thus the Court will concentrate on whether, assuming plaintiff's allegations are true, her memo was of public concern.

 Speech can fairly be characterized as a matter of public concern if the speech "relat[es] to any matter of political, social, or other concern to the community." *Connick v. Myers,* 461 U.S. 138, 146, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983). Plaintiff believes that the issues discussed in her memo "clearly touched upon matters of public concern ... [because she] complained about the crippling effect a staff reduction would have on the Department, as well as the ... disparate impact of the termination of minority employees...." (Pl.'s Mem. Opp.Dism. At 14.) On a perfunctory review plaintiff appears to be correct—her memo "relates" to issues about which the public might care. However, the Court cannot stop its analysis there, because whether speech involves a public concern is a question of law to be determined on the basis of "the content, form, and context of a given statement, as revealed by the whole record." *Id.* at 147–48 & n. 7, 103 S.Ct. at 1691 & n. 7.

 Based on the whole record, the Court finds that plaintiff's memo was not protected speech because it did not deal with matters of public concern, as that term has been defined in the caselaw. Simply put, "the First Amendment does not, under ordinary circumstances, protect an at-will high-level policy-making employee from being fired because of job-related opinions and ideas [she] expresses as part of [her] employment." *Fender v. City of Oregon City,* 811 F.Supp. 554, 561 (D.Or.1993), *aff'd,* 37 F.3d 1505 (9th Cir.1994).

Plaintiff relies heavily on the balancing test enunciated in *Pickering v. Board of Educ.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968), in support of her position. But the classic situation protected by the *Pickering* doctrine is a low-level public employee who expresses *personal* views on a matter of public concern that do not directly relate to the employee's work.

*Fender,* 811 F.Supp. at 560. By contrast, plaintiff's memo was written in the course of her employment. Although budgetary and race issues can be a matter of public concern, plaintiff was not stating her personal views on the subjects but rather her views as Acting Deputy Commissioner and General Counsel of the DEC. Accordingly, her speech does not come under the umbrella of *Pickering. Id.*

Although not a Second Circuit case, *Fender* appears to be exactly on point. The court there explained its rationale in great detail:

> Government does not operate on a consensus basis. Policy-making employees are not free, in the course of their employment, to openly pursue goals that are contrary to those established by the governing body.... Absent state law to the contrary, the Oregon City Commission is entitled to the services of a city manager who dances to the same music as the Commission. If the Commission disagrees with the policies advocated by the manager, the Commission has every right to replace him. Such considerations are at the very heart of the Supreme Court's balancing test [in *Pickering* ]. Perhaps the public would be better served by allowing the manager to speak freely when he disagrees with the policies being pursued by the Commission. That is a matter for the legislature, not the courts.

*Id.,* 811 F.Supp. at 561 (citations omitted). Here, the Governor and DEC Commissioner had decided to downsize plaintiff's department for budgetary reasons. Consequently they were entitled, without a doubt, to the services of an Acting Deputy Commissioner and General Counsel "who dances to the same music" as they do. Unfortunately for plaintiff (perhaps she would say *fortunately* ), she dances to the beat of a different drummer.

Plaintiff is correct that there are circumstances where statements made in the course of employment have been found sufficiently meritorious that the scales tip in favor of First Amendment protection. *See, e.g., Frank,* 1 F.3d at 1329; *Piesco v. City of New York, Dep't of Personnel,* 933 F.2d 1149, 1155 (2d Cir.), *cert. denied,* 502 U.S. 921, 112 S.Ct.

331, 116 L.Ed.2d 272 (1991). However, these cases can be distinguished from *Fender* and the present case because they typically deal with situations where the employee is engaged in "whistle-blowing," i.e., uncovering corruption and mismanagement that already exists in the employer's business and is being concealed. The plaintiff in *Frank,* for example, worked in a District Attorney's office and was fired after informing a judge about perceived improprieties in the office's handling of criminal cases. *Frank,* 1 F.3d at 1320. Plaintiff here has not contended, and cannot seriously contend, that she wrote her memo acting as a whistle-blower.

■ Plaintiff also claims that she was deprived of her First Amendment right to petition for redress of grievances when she was terminated for writing her memo to defendants. This claim is equally without merit because the instant action provides plaintiff with a vehicle for redress of grievances. *Sheppard,* 18 F.3d at 152 (court action provides vehicle where plaintiff alleges violation of right to seek redress of grievances).

### 4. Qualified Immunity Defense

■ Defendants argue that they cannot be held liable for damages on plaintiff's remaining First Amendment claims because they are protected by the qualified, or good faith, immunity doctrine. Contrary to plaintiff's apparent belief, defendants do not contend that they are immune from liability under Title VII. Qualified immunity is a creature of Section 1983 jurisprudence, and only plaintiff's First Amendment claims were brought pursuant to Section 1983. The Supreme Court has emphasized the importance of resolving the issue of qualified immunity early in the proceedings. Whether qualified immunity is applicable is a question of law, not fact, for the trial judge to resolve long before any trial. *Hunter v. Bryant,* 502 U.S. 224, 229, 112 S.Ct. 534, 537, 116 L.Ed.2d 589 (1991).

■ Section 1983 is written in absolute terms: it creates liability for any person, acting under color of state law, who violates the Constitution and laws of the United

States. No exceptions are mentioned in the statute. However, the Supreme Court consistently has held that all officers of the state possess some degree of immunity from liability. In the Court's eyes, the possibility of immunity for individuals is imperative because of "the injustice, particularly in the absence of bad faith, of subjecting to liability an officer who is required, by the legal obligations of his position, to exercise discretion." *Scheuer v. Rhodes,* 416 U.S. 232, 240, 94 S.Ct. 1683, 1688, 40 L.Ed.2d 90 (1974), *overruled on other grounds, Davis v. Scherer,* 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984). Moreover, there has been concern that the absence of immunity might make it more difficult to attract people into government service, or at least might chill the exercise of discretion. *Id.*

Thus the Supreme Court has seen a need to strike a balance; the immunity standard must provide sufficient liability to ensure compensation and deterrence, while according immunities adequate to encourage government employees to perform their duties. In some cases, such as where the state officer is performing judicial, legislative, or prosecutorial functions, this balancing leads to the conclusion that the officer is entitled to absolute immunity. *See, e.g., Stump v. Sparkman,* 435 U.S. 349, 355–56, 98 S.Ct. 1099, 1104, 55 L.Ed.2d 331 (1978); *Imbler v. Pachtman,* 424 U.S. 409, 418–424, 96 S.Ct. 984, 989–92, 47 L.Ed.2d 128 (1976). If officers are not performing one of the functions accorded absolute immunity, however, they consequently are entitled to the possibility of qualified immunity. In the present case, presumably because of the nature of their positions and the actions they have taken, defendants seek qualified immunity.

The fundamental question concerning qualified immunity revolves around the definition of "good faith." The ability of many injured plaintiffs, such as plaintiff here, to recover will turn on the standard for determining good faith. The Supreme Court has developed and modified the standard over many years. *See Scheuer,* 416 U.S. at 232, 94 S.Ct. at 1684–85; *Wood v. Strickland,* 420 U.S. 308, 321, 95 S.Ct. 992, 1000, 43 L.Ed.2d 214 (1975). These earlier cases contained both

an objective component (was the act reasonable?) and a subjective component (did the state officer believe it was reasonable?). Thus a plaintiff could refute the existence of good faith *either* by demonstrating that a reasonable state officer would find the action impermissible or by showing that the particular officer in question knew that his action was unreasonable. *See Wood,* 420 U.S. at 321–22, 95 S.Ct. at 1000–01, 43 L.Ed.2d 214.

In 1982, the Court substantially reformulated the test again. *See Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). *Harlow* held that malice, or subjective bad faith, on the part of government officials was no longer relevant in overcoming a claim of immunity. In other words, the Court expressly discarded one element of the two-part standard enunciated in *Scheuer* and *Wood.* In the Court's view it was too easy for plaintiffs to allege malice with the hope of finding evidence during discovery. Additionally, it was too difficult for trial courts to grant summary judgment on the malice question because subjective intent is a factual question that usually requires a trial. *Harlow,* 457 U.S. at 816–17, 102 S.Ct. at 2737–38. In sum, *Harlow* articulated the test that still controls today: "government officials performing discretionary functions ... generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818, 102 S.Ct. at 2738.

The Supreme Court clarified matters even further in *Anderson v. Creighton,* 483 U.S. 635, 636–38, 107 S.Ct. 3034, 3037–38, 97 L.Ed.2d 523 (1987). In *Anderson,* the defendant, an FBI agent, conducted a warrantless search of the plaintiff's home because the agent erroneously thought that bank robbers were hiding there. The Eighth Circuit denied the defendant qualified immunity because the law was settled that warrantless searches could not be performed without probable cause and exigent circumstances. The Supreme Court, however, reversed. Justice Scalia wrote that good faith immunity is not lost when a state officer violates the Fourth Amendment unless a reasonable state

officer in the same position would know that the conduct in question was impermissible. Although the First Amendment rather than the Fourth Amendment is involved here, the standard is the same: a state officer "may [not] be held personally liable for money damages if a reasonable [state] officer could have believed that the [action] comported with the [First] Amendment." *Cf. Id.* at 636–37, 107 S.Ct. at 3037 (dealing with Fourth Amendment).

■ The Court has already determined that defendants' action in firing plaintiff did in fact comport with the First Amendment, so it follows that a reasonable state officer could have believed that the firing did not violate plaintiff's First Amendment rights. However, even if plaintiff's memo were found to represent speech protected by the First Amendment, the Court believes that (1) the law is sufficiently murky or (2) the factual question is sufficiently close that a reasonable state officer could *still* believe that plaintiff's firing was permissible under the Constitution. Either way, therefore, defendants are entitled to qualified immunity from liability in regard to plaintiff's First Amendment claims.

## IV. CONCLUSION

Plaintiff has withdrawn her Third Cause of Action, under which she claimed that defendants' conduct violated her First Amendment right of association. Furthermore, even assuming the facts as alleged by plaintiff are true, she has failed to state a cause of action based on retaliatory discharge because she did not have a good faith, reasonable belief that her memo was protected by Title VII. Finally, defendants are qualifiedly immune from liability in regard to plaintiff's First Amendment claims. With no federal basis remaining, the Court declines to exercise jurisdiction over plaintiff's state law claims. For all the foregoing reasons, defendants' motion for judgment on the pleadings is hereby GRANTED and plaintiff's Complaint is DISMISSED.

**IT IS SO ORDERED.**