**Randi DUPONT–LAUREN, Plaintiff,**

v.

**SCHNEIDER (USA), INC. and Pfizer, Inc., Defendants.**

No. CIV. A. H–95–5345.

United States District Court, S.D. Texas.

Jan. 21, 1998.

Ulmer Graydon Wilson, Richard Haynes & Associates, Fritz Barnett, Barnett and Craddock, Houston, TX, for Plaintiff.

Gayla C. Crain, Jonni Walls, Epstein Becker and Green, Dallas, TX, Carole Dominguin Brown, Pfizer Inc., Legal Counsel, New York, NY, for Defendants.

### MEMORANDUM AND ORDER

CRONE, United States Magistrate Judge.

Pending before the court is Defendant Pfizer Inc.'s ("Pfizer") Motion for Judgment on the Pleadings, or in the Alternative, Motion for Summary Judgment (# 49) and Defendants Pfizer and Schneider (USA), Inc.'s ("Schneider") Motion for Summary Judgment (# 50). Having reviewed the pending motions, the submissions of the parties, the pleadings, and the applicable law, this court is of the opinion that Pfizer and Schneider's motion for summary judgment should be granted, rendering Defendant Pfizer's Motion for Judgment on the Pleadings moot.

### I. Background

On February 8, 1988, Randi Dupont–Lauren ("Dupont–Lauren"), a female, began working for Schneider and Pfizer (collective-

ly "the companies") as a technical sales representative in Schneider's cardiology division.[1] Schneider is a corporation engaged in the development, manufacture, and sale of pharmaceuticals and medical devices. At all times relevant to this suit, Schneider was a wholly-owned subsidiary of Pfizer. Prior to working for Schneider, Dupont–Lauren was employed by Schneider's predecessor, Angiomedics. During Dupont–Lauren's term of employment, Schneider's sales structure was organized into five regions, two of which were managed by women, and three of which were managed by men. Each regional sales manager received compensation that entailed a salary, a car allowance, and commissions based upon the sales volume and commissions earned by the sales representatives and senior sales representatives who served under the regional manager. Dupont–Lauren contends that because senior sales representatives have a higher volume than do regular sales representatives, the number of senior sales representatives assigned to a region directly affects the level of compensation received by the regional sales manager.

Dupont–Lauren alleges that she has experienced discriminatory treatment by Schneider since at least 1989. In October 1989, Dupont–Lauren applied for a management position in the peripheral division of Schneider. She was not offered the position allegedly because she looked too young. Later, in January 1991, she became Schneider's regional sales manager for the southern region of the United States, peripheral division. In February 1992, Dupont–Lauren was transferred to the position of acting regional sales manager for the western region of the United States, cardiology division. While in that position, she improved the region's sales performance so that it progressed from last place to first. Commensurate with this feat, Dupont–Lauren received the sales manager of the year award for 1991. In August 1992, Dupont–Lauren was transferred to the position of regional sales manager for the newly organized southwestern region of the United States, cardiology division. This was done on the recommendation of John W. House, Jr. ("House"), former national director of sales for Schneider and Dupont–Lauren's immediate supervisor, Bob Thatcher ("Thatcher"), former director of sales and marketing for Schneider, and Joe Laptewicz ("Laptewicz"), former president of Schneider.[2]

While serving as regional sales director for the southwestern region, Dupont–Lauren received the regional manager of the year award in 1992 and 1993 based on her management skills and volume of sales. In 1993, House gave Dupont–Lauren the highest possible rating, "excellent," in his evaluations. She received excellent ratings for leadership, communication skills, employee development, project management, and change in management. She was commended for being able to adapt to changing circumstances and for remaining active with training programs. In his deposition, however, House testified that Dupont–Lauren had good sales figures, but was continually deficient in areas relating to interpersonal skills and promoting the company's objectives.

At deposition, House set forth a litany of purported deficiencies in Dupont–Lauren's personality, habits, and management style. He stated that almost every sales representative in Dupont–Lauren's region complained about her and her management style on at least one occasion. For example, Jean Kallaky, a sales representative for Schneider, complained that some physicians with whom she worked did not like Dupont–Lauren's personality. Additionally, House observed that Dupont–Lauren did not attend portions of a sales meeting in September 1994 and was absent from an information booth at national medical meetings on several occasions. House also received complaints about Dupont–Lauren's rudeness from Tim Howard, Schneider's product manager, and from several customer service representatives including Bonnie Craven.

---

1. The cardiology division sells products related to the coronary arteries, as opposed to the peripheral division, which sells products related to "everything outside the coronary arteries."

2. Laptewicz was president of Schneider from 1992 to September 30, 1994. Since October 1994, he has served as president and CEO of Empi Incorporated, Dupont–Lauren's current employer.

House also related that he expended approximately eighty percent of his time addressing problems that arose out of Dupont–Lauren's sales region. He further asserted that Dupont–Lauren's poor interpersonal skills actually cost Schneider sales opportunities. According to House, Dave Hilfer and Sheila Rooney from St. Luke's Hospital ("St. Luke's") in Houston, Texas, requested that Dupont–Lauren not come to the hospital. Previously, St. Luke's had been one of Schneider's largest accounts. House opined that Schneider's loss of business at St. Luke's was a direct result of Dupont–Lauren's activities there. The staff's objection to Dupont–Lauren's presence at the hospital was reportedly based on their aversion to her abrasive style. House also stated that he admonished Dupont–Lauren regarding her deficient personal skills when he witnessed her berating Jim Foster, a Schneider sales representative. In addition, Laptewicz testified at deposition that he received complaints about Dupont–Lauren's interpersonal skills from employees such as Bill Mason, Schneider's director of sales.

Dupont–Lauren, however, contends that Schneider and Pfizer discriminated against her because of her sex in various instances. First, she alleges that the female regional sales managers had one senior sales representative assigned to their regions, while the male regional sales managers had two or more. This, she argues, resulted in lower commissions for the female managers. Dupont–Lauren contends that the apportionment of senior sales representatives demonstrates a pattern and practice of discrimination against female regional sales managers with respect to their compensation. The fact that Schneider had no female managers when she began her employment there, she submits, is also illustrative of Schneider's discriminatory practices.

Dupont–Lauren admits in her responses to the companies' interrogatories, however, that Schneider did not intentionally discriminate against her through work-assignment policies, procedures, or practices. Further, Dupont–Lauren conceded in her deposition that a promotion to a senior sales representative position is dependent upon several factors, including a prerequisite of three years employment as a sales representative, attainment of sales forecasts for two out of three years, and a recommendation by the sales representative's regional manager, the position that Dupont–Lauren held. Dupont–Lauren further admitted that the reason she had fewer senior sales representatives was "due to the newness of the representatives" whom she managed. Laptewicz's deposition testimony also underscores that the promotion of sales representatives to senior sales representative positions was based on the consensus of the national sales manager, regional manager, and the human resources department; the national sales manager could not create a senior sales representative position on his own volition. Moreover, Schneider does not require its sales representatives to relocate in order to equalize the distribution of senior sales representatives in each region. Additionally, Dupont–Lauren admits that, despite the reduced commissions earned because of the allocation of senior sales representatives, her total compensation from Schneider increased every year from 1992 until she resigned in 1996.

Dupont–Lauren also maintains that she was discriminated against in January 1994, when she received the runner-up regional manager of the year award rather than the regional manager of the year award. Schneider gave this distinction to Tom Doorley ("Doorley"). She alleges that Laptewicz informed her that Doorley received the award because management had "loaded Mr. Doorley's numbers so that he would get the award" instead of Dupont–Lauren.

She further contends that the companies discriminated against her by failing to promote her to any position higher than regional sales manager. In March 1993, Schneider promoted Troy Phelps ("Phelps") to the position of regional manager of the peripheral division. Dupont–Lauren alleges that in October and November 1992, she discussed a transfer to the peripheral division with Steve Healy ("Healy"), former national sales director of Schneider's peripheral division. She asserts that she was better qualified for the position than Phelps because he had worked for the company for only a year and

had no management experience. In March 1993, after Schneider awarded Phelps the regional manager position, Dupont–Lauren contacted Jan Dick ("Dick"), Schneider's vice president of human resources, to inquire about the promotion of Phelps and to inform Dick that she wanted to be considered for national sales positions in both the cardiology and peripheral divisions.

Dick testified at deposition, however, that Dupont–Lauren never applied for the regional manager position awarded to Phelps, even though the position was posted. Dick further asserted that Dupont–Lauren never formally or informally applied for any higher position in Schneider. Laptewicz explained in his deposition that because Dupont–Lauren was already a regional manager in the cardiology division, transferring her to the position of regional manager in the peripheral division would have been a lateral transfer rather than a promotion. Laptewicz further testified that the decision to place Phelps in that position was not based on his sex nor on the sex of any competing candidate. Moreover, he stated that Dupont–Lauren's failure to obtain any other position was not based on her sex; Schneider never had a practice of promoting based on the candidate's sex and, indeed, Schneider had an express corporate policy prohibiting discrimination on the basis of an employee's sex.

Dupont–Lauren alleges that in June 1993, shortly after Phelps's promotion, Schneider promoted John Schorgl ("Schorgl") to the position of national sales manager for the peripheral division. She maintains that she should have been promoted to this position because she had greater seniority and Schorgl had no management experience. According to Dupont–Lauren, she had previously informed Dick that she wanted to be considered for this position and that she was willing to relocate. After Schorgl's promotion, Dupont–Lauren contacted Dick to inquire why she had not been considered for the position. Dick allegedly responded that Schneider thought that Dupont–Lauren was not willing to relocate. Dick testified in her deposition that Schorgl was merely the acting national sales manager and that a prerequisite for the position was residency in

Minneapolis, Minnesota, which Schorgl satisfied. Schorgl held the acting sales manager position until Schneider awarded him the national sales manager position for the peripheral division in January 1994. At deposition, Dick testified that this position was awarded to Schorgl because he had experience as the acting manager, had a history of sales performance, put together the peripheral management team, demonstrated leadership ability, and had general experience in the industry.

Dupont–Lauren conceded at deposition that, despite her claims of discrimination, harassment, and retaliation, the personnel manager assisted her in her attempts to obtain a management position with other affiliated companies. Additionally, in January 1995, House strongly encouraged Dupont–Lauren to seek a promotion to the position of national sales manager for Schneider's peripheral division. According to Dupont–Lauren, she never applied for this position because the immediate supervisor, Schorgl, was known to discriminate against women. Schneider eventually promoted Doorley, another regional manager, to the position. Dupont–Lauren admitted that, for at least some of the time period at issue, the companies had no positions available for which she was qualified. As mentioned above, Dupont–Lauren did not apply for several management positions despite the fact that Schneider publicized the openings. In addition, Dupont–Lauren does not dispute that all of the upper management positions with Schneider for which she was qualified were filled prior to April 24, 1994, except the position filled by Doorley, which she admits she did not seek.

Dupont–Lauren further alleges that Schneider and Pfizer discriminated against her in Schneider's assignment of "wallstent" or "stent" sites. "The stent sites involved human clinical trials that Schneider was planning to conduct with a 'stent' (a new product that offered certain advantages in certain surgical procedures) that it was seeking to market . . . ." The Food and Drug Administration ("FDA") required participating hospitals to follow a protocol approved by the FDA, to conduct the tests for a specified period of time, and to use a certain number

of patients in the trials. Dupont–Lauren contends that the stent sites provided an opportunity for significant sales and were an important future market for the company, although Schneider provided the device to the participating hospitals free of charge. Schneider notes that FDA regulations specifically prohibited the use of stent trials or stent site selection as a sales tool. In response to this, Dupont–Lauren points to an addendum to a proposal concerning the sale of angioplasty products that was sent to Allegheny General Hospital in Pittsburgh, Pennsylvania, by Schneider's former vice-president of sales and marketing, William F. Gearhart ("Gearhart"). The addendum states that "Allegheny will be considered for Primary Investigator for the Coronary Wallstent® project. Allegheny General will also be an Alpha Text site for all new Product Introductions." This language, however, merely promised consideration and did not guarantee stent sites in exchange for sales.

Dupont–Lauren contends that the companies discriminated against her in 1994 by providing her region with fewer stent sites than those regions with male managers. She contends that the three male managers received three stent sites each. In comparison, the other female manager received two stent sites, while Dupont–Lauren received only one. This assignment of sites, she contends, placed her in a disadvantageous sales position. The affidavit of Bob Waite ("Waite"), regional manager of the Miami region of Schneider/Namic,[3] indicates that the selection of stent sites was based on the qualifications of the particular sites. The deposition testimony of Mark Gillick ("Gillick"), the director of the coronary stent program, corroborates Waite's affidavit. He stated that Schneider wanted to conduct the testing of the device at high-profile sites which would generate publicity for the device and that Schneider considered a multiplicity of factors in selecting sites including: the potential site's amenability to a contract provision designating Minnesota as the forum for any

litigation connected to the device; whether the hospitals were under investigation by the government for billing improprieties; and geographic proximity to other sites. The decisions as to which hospitals were chosen as stent sites were made jointly by a selection committee composed of Jane Douglas, medical director for Schneider, Gearhart, Laptewicz, David Berger, David Freed, Jim Vanderwick, Sandy Flieger, and Gillick. According to Gillick, the sex of the regional manager in whose territory a potential site was located was never a factor in the decisions.

Dupont–Lauren also contends that she was made the object of retaliation for complaining about Schneider's discriminatory practices regarding the assignment of stent sites. She initially complained to Gillick on September 20, 1994, "about the difficulties of being a female in the company."[4] According to her deposition testimony, however, she "did not raise a complaint of discrimination with Mr. Gillick." Nevertheless, she alleges that after her conversation with Gillick, House and Gearhart retaliated against her. Dupont–Lauren also states that she actively began seeking employment elsewhere immediately after her meeting with Gillick.

She maintains that, within a week of her complaint, House accused Dupont–Lauren of pressuring Gillick for a stent site and inquired about her complaint. In her deposition, Dupont–Lauren stated that when House asked her whether she felt she was being discriminated against she refused to answer him. House then informed Dupont–Lauren that several physicians at the Texas Heart Institute ("THI") were upset with her. When she protested that her level of sales at THI was excellent, House replied that it did not matter how well she performed, what mattered was who she knew and how she reacted to them. Although Dupont–Lauren did not make this allegation in her complaint, in her answers to interrogatories, dated July 16, 1996, she stated for the first time that

3. Schneider/Namic is the successor to Schneider (USA) Inc.

4. In Dupont–Lauren's undated affidavit that was notarized on February 16, 1995, she asserts that

this meeting with Gillick occurred in 1994. Her response to Schneider and Pfizer's motion for summary judgment states that the meeting occurred in 1995.

House's statement constitutes sexual harassment. She also contends that House made this statement to her on three occasions. Further, she admits that she never informed other management personnel at Schneider or Pfizer of House's statements. House explained at his deposition that he did not intend the statement to be perceived in a sexual sense, but that he meant the statement to convey the idea that Dupont–Lauren needed to work on her interpersonal skills in order to increase her effectiveness as a manager.

According to Dupont–Lauren, the retaliation continued when, in a letter dated October 23, 1994, House reprimanded Dupont–Lauren for attempting to pressure Gillick into providing her with additional stent sites. Three days later, on October 26, 1994, House allegedly received complaints about her from a sales representative assigned to her region, Casey Shattuck ("Shattuck"). House testified that Shattuck advised him that "[t]oo many physicians in San Antonio don't like Randi, and Schneider as a consequence." Shattuck also purportedly stated that the physicians' dislike of Dupont–Lauren was having an adverse effect on his ability to make sales. "[W]hen they found out he worked for Randi Dupont–Lauren, they gave him a lot of resistance to selling products." Sometime after this, while acknowledging her strong sales performance, House gave Dupont–Lauren a relatively poor performance evaluation for 1994. Dupont–Lauren stated in her affidavit that during her performance review, House threatened to terminate her because she was not politically correct, but also informed her that he could not terminate her because her sales numbers were excellent. Nevertheless, Dupont–Lauren contends that this evaluation prevented her from receiving the salary increase to which she believed she was entitled in 1995. She argues that because each subsequent salary increase is based on an employee's present salary, prior failures to increase base salary directly affect future base salary increases. Thus, Dupont–Lauren contends that the retaliation continued for the remainder of her employment with Schneider.

Despite the allegation of diminished salary, Dupont–Lauren admitted in her responses to interrogatories that her salary with Schneider increased from $118,422 in 1993, to $134,474 in 1994, and to $158,575 in 1995. Further, Dupont–Lauren estimated that her base salary constituted only fifty percent of her total compensation from Schneider. Notably, 1995 was one of Dupont–Lauren's best sales years with the company, and she received an increase in her base salary that became effective January 1, 1996.

The companies contend that any reprimands or diminished evaluations of Dupont–Lauren were precipitated by her deficient conduct. Even Dupont–Lauren admits that, upon the urging of House, she participated in self-awareness and self-development courses in November and December 1994. Further, she acknowledged in her deposition that one of the sale representatives whom Dupont–Lauren supervised complained that she was having a negative effect on some of his sales accounts. Additionally, Dupont–Lauren admitted that she told her representatives to come to her first, rather than House, to make complaints, despite the fact that House wanted to be informed of problems in her region. Dupont–Lauren also conceded in her deposition that Karol Kleinenbroich and someone named "Jim" may have complained about her to her superiors. Further, Dupont–Lauren admitted that House had informed her that physicians at THI were upset with her, and that because of this, he had to remove this account from her supervision.

Dupont–Lauren contends that the retaliation continued when, in January 1995, she did not receive the regional manager of the year award nor the circle of excellence award. She admits that the person with the greatest sales, Doorley, did not receive the award because he left the company in November 1994. She complains, however, that Waite, the manager with the "second highest penetration percentage," received the circle of excellence award. It is Schneider's position that although Dupont–Lauren had the second-highest sales index, she failed to satisfy other prerequisites of the award. Specifically, House set forth in a memorandum dated April 4, 1994, that "To qualify for the award

trip, ... representatives or managers must be at or above 100% of forecast." Dupont–Lauren acknowledges that this requirement applied to all representatives, not just to her, and that her sales did not meet or exceed her forecasts.

She further alleges that the companies retaliated against her by failing to include her in important communications, failing to invite her to important meetings, certain employees' failing to speak to her, answering her questions in a demeaning fashion, giving her tardy notice of meetings, and surreptitiously contacting Dupont–Lauren's customers in 1995. Among these acts was House's order that Dupont–Lauren not participate in a meeting at St. Luke's. Nevertheless, Dupont–Lauren admitted in her deposition that during the period in which she alleges the retaliation occurred, Schneider awarded her the regional manager of the year award for 1995, the circle of excellence award, the president's club award, and the quarterly regional manager of the year award on two occasions. Further, she conceded that, hypothetically, if physicians at customer-hospitals requested that Dupont–Lauren not attend meetings, it would be proper for Schneider to accede to their requests. Additionally, she admitted that she was unsure of the nature of the conversations that took place during Schneider's contacts with customers in her region.

Additionally, although Dupont–Lauren sought and obtained House's permission to move to Denver, Colorado, in 1994, she alleges that House retaliated against her when he subsequently reneged on that approval in June 1996, after Dupont–Lauren had purchased a home in Denver. Nevertheless, Dupont–Lauren admitted in her deposition that House eventually approved her relocation to Denver. Furthermore, Dupont–Lauren resigned her position with Schneider to accept a position with a company that required her to relocate to Shoreview, Minnesota. Finally, Dupont–Lauren alleges that the companies retaliated against her by asking her to make a presentation at a 1996 retreat for regional managers in New Orleans. Dupont–Lauren conceded at deposition, however, that other regional managers were also asked to make presentations at the retreat and that they did so.

Despite these extensive allegations, Dupont–Lauren admitted at deposition that she never complained about the alleged sexual discrimination to anyone in "the company." She also acknowledged that she was never discharged by Schneider or Pfizer. Dupont–Lauren resigned from Schneider in May 1996 in order to accept the position of national sales manager with Empi Incorporated on June 10, 1996. Prior to that, on February 17, 1995, Dupont–Lauren filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and subsequently received a right to sue letter.

## II. Analysis

### A. Summary Judgment Standard

Rule 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Williams v. Adams, 836 F.2d 958, 960 (5th Cir.1988). The moving party, however, need not negate the elements of the nonmovant's case. See Wallace v. Texas Tech Univ., 80 F.3d 1042, 1047 (5th Cir. 1996) (citing Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir.1994)).

Once a proper motion has been made, the nonmoving party may not rest upon mere allegations or denials in the pleadings, but must set forth specific facts showing the existence of a genuine issue for trial. See Celotex Corp., 477 U.S. at 322–23; Anderson,

477 U.S. at 257; *Wallace*, 80 F.3d at 1047; *Little*, 37 F.3d at 1075. All evidence must be "construed in the light most favorable to the nonmoving party without weighing the evidence, assessing its probative value, or resolving any factual disputes." *Williams v. Time Warner Operation, Inc.*, 98 F.3d 179, 181 (5th Cir.1996) (citing *Lindsey v. Prive Corp.*, 987 F.2d 324, 327 n. 14 (5th Cir.1993)). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 49 n. 5, 111 S.Ct. 401, 112 L.Ed.2d 349 (1990) (quoting *Anderson*, 477 U.S. at 255). Nevertheless, "conclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy the non-movant's burden." *Douglass v. United Serv. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir.1996) (citing *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir.), *cert. denied*, 513 U.S. 871, 115 S.Ct. 195, 130 L.Ed.2d 127 (1994)); *see Wallace*, 80 F.3d at 1047; *Little*, 37 F.3d at 1075. Summary judgment is mandated if the non-movant fails to make a showing sufficient to establish the existence of an element essential to her case on which she bears the burden of proof at trial. *See Celotex Corp.*, 477 U.S. at 322. "In such situation, there can be 'no genuine issue as to any material fact' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322–23.

### B. *Discrimination Claims Under Title VII*

#### 1. *Statute of Limitations*

■ In Texas, to maintain a Title VII claim, a plaintiff must file her charge of discrimination with the EEOC and/or the Texas Commission on Human Rights within 300 days of the "alleged unlawful employment practice." *See* 42 U.S.C. § 2000e–5(e); *Anson v. University of Tex. Health Science Ctr.*, 962 F.2d 539, 540 (5th Cir.1992). Generally, the limitations period begins on the date the discriminatory act occurred, and a plaintiff cannot sustain her claims based on incidents occurring before the 300–day period. *See Waltman v. International Paper Co.*, 875 F.2d 468, 474 (5th Cir.1989). Any act occurring outside the applicable filing period "may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue, but separately considered, it is merely an unfortunate event in history which has no present legal consequences." *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 558, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977); *see Ray v. Tandem Computers, Inc.*, 63 F.3d 429, 434 n. 12 (5th Cir.1995); *Cortes v. Maxus Exploration Co.*, 977 F.2d 195, 199 (5th Cir.1992); *Merrill v. Southern Methodist Univ.*, 806 F.2d 600, 604 n. 5 (5th Cir.1986); *Downey v. Southern Natural Gas Co.*, 649 F.2d 302, 305 (5th Cir.1981).

■ The courts, however, have recognized an equitable exception "where the unlawful employment practice manifests itself over time, rather than as a series of discrete acts." *Waltman*, 875 F.2d at 474; *Abrams v. Baylor College of Medicine*, 805 F.2d 528, 532 (5th Cir.1986). In order to extend the statute of limitations period under this exception, known as a continuing violation, the plaintiff must file an EEOC charge within at least 300 days of one of the alleged acts of discrimination. *See Waltman*, 875 F.2d at 474; *see also Delaware State College v. Ricks*, 449 U.S. 250, 258, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980). "A continuing violation is one that could not reasonably have been expected to be made the subject of a lawsuit when it first occurred because its character as a violation did not become clear until it was repeated during the limitations period." *See Dasgupta v. University of Wis. Bd. of Regents*, 121 F.3d 1138, 1139 (7th Cir.1997) (citing *Rush v. Scott Specialty Gases, Inc.*, 113 F.3d 476, 481–82 (3d Cir.1997); *Galloway v. General Motors Serv. Parts Operations*, 78 F.3d 1164, 1167 (7th Cir.1996); *Berry v. Board of Supervisors of L.S.U.*, 715 F.2d 971, 981 (5th Cir.1983)). The continuing violation theory relieves a plaintiff of establishing that all of the discriminatory conduct occurred within the limitations period if the plaintiff can show a series of related acts, at least one of which occurred within the limitations period. *See Messer v. Meno*, 130 F.3d 130, 135 (5th Cir.1997).

■ The purpose behind allowing a plaintiff to maintain a *cause of action under the* continuing violation theory is to permit redress for acts the discriminatory character of which was not apparent at the time they occurred. *See Speer v. Rand McNally & Co.,* 123 F.3d 658, 663–64 (7th Cir.1997); *Doe v. R.R. Donnelley & Sons Co.,* 42 F.3d 439, 446 (7th Cir.1994). A continuing violation tolls the statute of limitations because such statutes are meant only to prevent stale claims. *See McGregor v. Louisiana State Univ. Bd. of Supervisors,* 3 F.3d 850, 867 (5th Cir.1993) (citing *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 380, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982)), *cert. denied,* 510 U.S. 1131, 114 S.Ct. 1103, 127 L.Ed.2d 415 (1994). " 'Where the challenged violation is a continuing one, the staleness concern disappears.' " *Id.; see also Glass v. Petro–Tex Chem. Corp.,* 757 F.2d 1554, 1560 (5th Cir. 1985). If none of the alleged acts occurred within 300 days of the filing of the EEOC charge, however, the plaintiff's cause of action for employment discrimination is timebarred. *See Delaware State College,* 449 U.S. at 258; *Waltman,* 875 F.2d at 474–75; *Abrams,* 805 F.2d at 533. The Fifth Circuit has cautioned that "[t]his theory of continuing violation has to be guardedly employed because within it are the seeds of destruction of the statute of limitation in Title VII cases." *Abrams,* 805 F.2d at 533.

■ Here, it is undisputed that Dupont–Lauren did not file an EEOC charge within 300 days of the first purported incident of discrimination. In her response to the defendants' motion for summary judgment, Dupont–Lauren stated that she was discriminated against "almost from the beginning" of her employment. At her deposition, Dupont–Lauren testified that she believed Schneider discriminated against her as far back as 1989 or 1990.

Q: Is there anything else that goes to the basis of that statement that we have not discussed already today?
A: There was a time when I could not get promoted even to a Regional Manager.
Q: When was that?
A: In 1990 I applied.

&ast; &ast; &ast; &ast; &ast; &ast;

Q: So, this picture, going back to 1990, is what you base this allegation on ·in part— that they have failed and refused to promote you to any higher level than Regional Manager?
A: The discrimination goes back a long way.

&ast; &ast; · &ast; &ast; &ast; &ast;

Q: All right. You told me back in 1990 you did not get a promotion to Regional Manager that you thought you should have had?
A: It would have been late '89 for the promotion in 1990, yes.

Dupont–Lauren, however, waited to file a charge of discrimination with the EEOC until February 17, 1995. Therefore, unless a continuing violation is established, Dupont–Lauren may recover only for conduct that occurred on or after April 24, 1994, 300 days prior to February 17, 1995.

The Fifth Circuit has adopted a multifactor test to determine the existence of a continuing violation. *See Berry,* 715 F.2d at 981. These factors include subject matter, frequency, and permanence.

This inquiry, of necessity, turns on the facts and context of each particular case. Relevant to the determination are the following three factors, which we discuss, but by no means consider to be exhaustive. The first is subject matter. Do the alleged facts involve the same type of discrimination, tending to connect them in a continuing violation? The second is frequency. Are the alleged acts recurring (e.g., a biweekly paycheck) or more in the nature of an isolated work assignment or employment decision? The third factor, perhaps of most importance, is degree of permanence which should trigger an employee's awareness and duty to assert his or her rights, or which should indicate to the employee that the continued existence of the adverse consequences of the act is to be expected without being dependent on a continuing intent to discriminate?

*Id.* "The focus is on what event, in fairness and logic, should have alerted the average lay person to act to protect h[er] rights."

*Glass,* 757 F.2d at 1561 (citations omitted); *see also Messer,* 130 F.3d at 135; *Abrams,* 805 F.2d at 534.

 In analyzing the permanence factor, the court examines whether a discrete event triggered a duty of the plaintiff to assert her rights. *See Waltman,* 875 F.2d at 476. Basically, permanence is an inquiry into what the plaintiff knew or should have known at the time of the discriminatory act. *See Sabree v. United Bhd. of Carpenters & Joiners,* 921 F.2d 396, 402 (1st Cir.1990). If a plaintiff knows or with the exercise of reasonable diligence would have known that she suffered from discrimination, she "may not sit back and accumulate all the discriminatory acts and sue on all within the statutory period applicable to the last one." *Moskowitz v. Trustees of Purdue Univ.,* 5 F.3d 279, 282 (7th Cir.1993). Thus, as the First Circuit noted:

> A knowing plaintiff has an obligation to file promptly or lose his claim. This can be distinguished from a plaintiff who is unable to appreciate that he is being discriminated against until he has lived through a series of acts and is thereby able to perceive the overall discriminatory pattern.

*Sabree,* 921 F.2d at 402; *Martin v. Frank,* 788 F.Supp. 821, 826 (D.Del.1992).

 The Fifth Circuit has recognized that "[a]cts of harassment that create an offensive or hostile work environment generally do not have the same degree of permanence as, for example, the loss of promotion." *Waltman,* 875 F.2d at 476; *see West v. Philadelphia Elec. Co.,* 45 F.3d 744, 755–56 (3d Cir.1995). In the latter example, there is an element of permanence to the discriminatory action that should, in most cases, alert a plaintiff that his rights have been violated. *See Stair v. Lehigh Valley Carpenters Local Union No. 600,* 813 F.Supp. 1112, 1116 (E.D.Pa.1993). In the case at bar, Dupont–Lauren testified that she believed as far back as 1989 or 1990 that the companies were discriminating against her. This testimony indicates actual knowledge of perceived discriminatory treatment or at least sufficient notice to alert an employee that an unachieved promotion might be based on a discriminatory motive. *See Waltman,* 875 F.2d at 476. Failure to promote has such a degree of permanence that a reasonably prudent person in Dupont–Lauren's situation would have appreciated that action was warranted when she failed to receive the promotions she sought. *See Alldread v. City of Grenada,* 988 F.2d 1425, 1432 (5th Cir.1993); *Glass,* 757 F.2d at 1560; *see also Philadelphia Elec. Co.,* 45 F.3d at 755; *Weeks v. Coury,* 951 F.Supp. 1264, 1270 (S.D.Tex.1996); *Hershey v. Praxair, Inc.* 948 F.Supp. 29, 32 (S.D.Tex.1996). Dupont–Lauren's failure to promote claims address discrete instances of alleged discrimination that have a permanence precluding a continuing violation analysis. *See Rush,* 113 F.3d at 483; *Weeks,* 951 F.Supp. at 1270. The events that she describes would have alerted the average lay person to act to protect her rights. *See Alldread,* 988 F.2d at 1432. "A knowing plaintiff has the obligation to file promptly or lose [her] claim." *Smith v. Bath Iron Works Corp.,* 943 F.2d 164, 166 (1st Cir.1991). "If she believed [her employer] was not considering her for available positions as promised, she should have reacted at that time. Waiting to see what would happen next was pointless; the harm, if any, was already inflicted." *Rush,* 113 F.3d at 483. Accordingly, Dupont–Lauren's failure to promote claims based on events occurring prior to April 24, 1994, are time-barred.

### 2. *Burden of Proof*

Title VII provides that "[i]t shall be an unlawful employment practice for an employer—(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1).

In *McDonnell Douglas* and *Burdine,* the United States Supreme Court outlined the burden-shifting framework generally applicable in employment discrimination cases. *See Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Where, as here, there is no direct evidence of discrimi-

nation, a plaintiff must initially establish a *prima facie* case by satisfying a four-element test from which a discriminatory motive may be inferred, thus creating a rebuttable presumption of intentional discrimination. *See Wallace,* 80 F.3d at 1047 (citing *Meinecke v. H & R Block,* 66 F.3d 77, 83 (5th Cir.1995)); *Davis v. Chevron U.S.A., Inc.,* 14 F.3d 1082, 1087 (5th Cir.1994) (citing *Burdine,* 450 U.S. at 252–53). Once the plaintiff establishes a *prima facie* case, then the burden shifts to the defendant to articulate—but not prove—a legitimate, nondiscriminatory reason for its employment decision. *See McDonnell Douglas Corp.,* 411 U.S. at 802; *Davis,* 14 F.3d at 1087; *see also Marcantel v. Department of Transp. & Dev.,* 37 F.3d 197, 199 (5th Cir. 1994). If the employer meets its burden, the *prima facie* case is dissolved, and the burden shifts back to the plaintiff to establish that the reason proffered by the employer is merely a pretext for discrimination. *See McDonnell Douglas Corp.,* 411 U.S. at 802; *Travis v. Board of Regents of the Univ. of Tex. Sys.,* 122 F.3d 259, 263 (5th Cir.1997); *Marcantel,* 37 F.3d at 200; *Moham v. Steego Corp.,* 3 F.3d 873, 875 (5th Cir.1993), *cert. denied,* 510 U.S. 1197, 114 S.Ct. 1307, 127 L.Ed.2d 658 (1994). To demonstrate a "pretext for discrimination," the plaintiff must show both that the employer's proffered reason was false and that discrimination was the real reason. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 515, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). At all times, however, the plaintiff has the ultimate burden to prove intentional discrimination. *See id.* 509 U.S. at 507; *Marcantel,* 37 F.3d at 200.

The Fifth Circuit has formulated the plaintiff's burden under *St. Mary's Honor Ctr.* as one of establishing that the employer's nondiscriminatory reason is not credible and that an unlawful discriminatory intent motivated the employer's action. *See Walton v. Bisco Indus.,* 119 F.3d 368, 370 (5th Cir.1997); *Polanco v. Austin,* 78 F.3d 968, 976 (5th Cir.1996); *Ray v. Iuka Special Mun. Separate Sch. Dist.,* 51 F.3d 1246, 1249 (5th Cir.1995). "Under *Hicks,* '[i]t is not enough, in other words, to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination.'" *Id.* (quoting *St. Mary's Honor*

*Ctr.,* 509 U.S. at 519); *see Walton,* 119 F.3d at 370. "The question is not whether an employer made an erroneous decision; it is whether the decision was made with discriminatory motive." *Mayberry v. Vought Aircraft Co.,* 55 F.3d 1086, 1091 (5th Cir.1995); *accord Odom v. Frank,* 3 F.3d 839, 850 (5th Cir.1993); *Little v. Republic Refining Co.,* 924 F.2d 93, 97 (5th Cir.1991). In the context of a motion for summary judgment, "[a] jury issue will be presented and a plaintiff can avoid summary judgment ... if the evidence taken as a whole (1) creates a fact issue as to whether each of the employer's stated reasons was what actually motivated the employer and (2) creates a reasonable inference that [plaintiff's protected status] was a determinative factor in the actions of which the plaintiff complains." *Rhodes v. Guiberson Oil Tools,* 75 F.3d 989, 994 (5th Cir.1996). The burden-shifting approach may be dispensed with altogether, however, if the plaintiff is able to establish intentional discrimination by direct evidence of discriminatory motive. *See Wallace,* 80 F.3d at 1047–48; *Kendall v. Block,* 821 F.2d 1142, 1145 (5th Cir.1987); *Ramirez v. Sloss,* 615 F.2d 163, 168 (5th Cir.1980).

Nevertheless, an employee's own subjective belief of discrimination, no matter how genuine, cannot serve as the basis for judicial relief. *See, e.g., Nichols v. Loral Vought Sys. Corp.,* 81 F.3d 38, 42 (5th Cir. 1996); *Douglass,* 79 F.3d at 1429; *Ray,* 63 F.3d at 434; *Armendariz v. Pinkerton Tobacco Co.,* 58 F.3d 144, 152–53 (5th Cir.1995), *cert. denied,* 516 U.S. 1047, 116 S.Ct. 709, 133 L.Ed.2d 664 (1996); *EEOC v. Louisiana Office of Community Servs.,* 47 F.3d 1438, 1448 (5th Cir.1995); *Portis v. First Nat'l Bank of New Albany,* 34 F.3d 325, 329 (5th Cir.1994); *Grizzle v. Travelers Health Network, Inc.,* 14 F.3d 261, 268 (5th Cir.1994); *Molnar v. Ebasco Constructors, Inc.,* 986 F.2d 115, 119 (5th Cir.1993); *Republic Refining Co.,* 924 F.2d at 96. Although Title VII protects employees against discrimination in the terms and conditions of employment, it does not afford minorities special preference or place upon the employer an affirmative duty to accord such persons special treatment. *See* 42 U.S.C. § 2000e–2(j); *see also Burdine,*

450 U.S. at 259; *Sessions v. Rusk State Hosp.*, 648 F.2d 1066, 1071 (5th Cir.1981); *Wynn v. Columbus Mun. Separate Sch. Dist.*, 692 F.Supp. 672, 684 (N.D.Miss.1988). Furthermore, the employment discrimination laws are "not intended to be a vehicle for judicial second-guessing of business decisions, nor ... to transform the courts into personnel managers." *Louisiana Office of Community Servs.*, 47 F.3d at 1448 (citing *Bienkowski v. American Airlines, Inc.*, 851 F.2d 1503, 1507–08 (5th Cir.1988)); *Bodenheimer v. PPG Indus., Inc.*, 5 F.3d 955, 959 (5th Cir.1993); *see also Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 578, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978); *Walton*, 119 F.3d at 372; *Waggoner v. City of Garland*, 987 F.2d 1160, 1165 (5th Cir.1993).

### 3. *Dupont–Lauren's Claims*
#### a. *Failure to Promote*

■ In order to establish a *prima facie* case of failure to promote under Title VII, a plaintiff must show that:

1. she is a member of a protected group;
2. she sought or applied for a position for which she was qualified;
3. she was rejected; and
4. after she was rejected, the employer promoted or continued to seek other candidates not in the protected group.

*See Grimes v. Texas Department of Mental Health & Mental Retardation*, 102 F.3d 137, 140 (5th Cir.1996); *see also Brill v. Lante Corp.*, 119 F.3d 1266, 1270 (7th Cir.1997); *Combs v. Plantation Patterns*, 106 F.3d 1519, 1539 (11th Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 685, 139 L.Ed.2d 632 (1998) (No. 97–361); *Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 959–60 (4th Cir.1996); *Jones v. Flagship Int'l*, 793 F.2d 714, 724 (5th Cir.1986), *cert. denied*, 479 U.S. 1065, 107 S.Ct. 952, 93 L.Ed.2d 1001 (1987).

■ The *prima facie* case is a flexible standard that may be modified to relate to different factual situations. *See Brill*, 119 F.3d at 1270; *Isenbergh v. Knight–Ridder Newspaper Sales, Inc.*, 97 F.3d 436, 440 (11th Cir.1996); *Wohl v. Spectrum Mfg., Inc.*, 94 F.3d 353, 358 (7th Cir.1996). Accordingly, courts have excused an employee's failure to

apply for a position in a variety of situations. A formal application is not a necessary aspect of a plaintiff's *prima facie* case when such a gesture would be futile. *See International Bhd. of Teamsters v. United States*, 431 U.S. 324, 365, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); *Chambers v. Wynne Sch. Dist.*, 909 F.2d 1214, 1217 (8th Cir.1990) (failure to apply formally will be excused if plaintiff makes every reasonable attempt to convey interest in job to employer); *Easley v. Empire, Inc.*, 757 F.2d 923, 930 n. 7 (8th Cir. 1985). In such a case, however, the plaintiff must present "overwhelming evidence of pervasive discrimination in all aspects of the employer's internal employment practices." *Kreuzer v. Brown*, 128 F.3d 359, 363 n. 2 (6th Cir.1997) (quoting *Harless v. Duck*, 619 F.2d 611, 617–18 (6th Cir.1980)); *see also Monfort, Inc. v. NLRB*, 965 F.2d 1538, 1546 (10th Cir.1992).

■ Similarly, a formal application will not be required where a vacant position was not posted or where the normal hiring procedures did not entail formal application. *See EEOC v. Metal Serv. Co.*, 892 F.2d 341, 348 (3d Cir.1990); *Paxton v. Union Nat'l Bank*, 688 F.2d 552, 568 (8th Cir.1982), *cert. denied*, 460 U.S. 1083, 103 S.Ct. 1772, 76 L.Ed.2d 345 (1983); *Royal v. Missouri Highway Transp. Comm'n*, 655 F.2d 159, 163 n. 5 (8th Cir. 1981); *Simon v. Honeywell, Inc.*, 642 F.2d 754, 755 n. 3 (5th Cir.1981). In these situations, however, the plaintiff must show there was an available position and that she expressed some interest in a promotion or that the employer "has some reason or duty to consider [her] for the post." *Kehoe v. Anheuser–Busch*, 96 F.3d 1095, 1105 n. 13 (8th Cir.1996) (citing *Fowle v. C & C Cola*, 868 F.2d 59, 68 (3d Cir.1989)); *see also Gafford v. General Elec. Co.*, 997 F.2d 150, 169 (6th Cir.1993); *Jones*, 793 F.2d at 724; *Holsey v. Armour & Co.*, 743 F.2d 199, 208–09 (4th Cir.1984); *Carmichael v. Birmingham Saw Works*, 738 F.2d 1126, 1133 (11th Cir.1984); *Goff v. Continental Oil Co.*, 678 F.2d 593, 596 n. 2 (5th Cir.1982).

■ Here, Dupont–Lauren has established the first *prima facie* element because, as a woman, she is a member of a protected

class under Title VII. With respect to the second element, Dupont–Lauren admitted that she did not apply for the regional manager position for the peripheral division in March 1993, despite the fact that the position was posted in the normal fashion. Similarly, she did not formally apply for the position of national sales manager of the peripheral division, which was filled in January 1994 by Schorgl. Although Dupont–Lauren contends that the position was not posted and she was not aware that it was available, she has not shown that her employer had a duty or reason to consider her for this post. Moreover, while she knew of the opening and was encouraged to apply, Dupont–Lauren did not seek the position of national sales manager of the peripheral division in 1995, which was posted and was eventually filled by Doorley. This is the only promotion to senior management that occurred within the actionable 300–day period, but Dupont–Lauren declined to submit an application. Thus, she cannot establish a *prima facie* case of discriminatory failure to promote.

■ Further, if Dupont–Lauren had applied for the 1994 national sales manager position, peripheral division, and this claim were not otherwise time-barred, Schneider has set forth legitimate, non-discriminatory reasons for selecting Schorgl instead of her. Specifically, Schneider stated that it took into consideration several factors including the fact that Schorgl had been serving as the acting national sales manager for six months prior to his elevation to the position, he was a top performer in Shneider's peripheral division, his history of sales performance was excellent, he assisted in the implementation of the peripheral management team to make decisions and keep projects moving, and he exhibited exemplary leadership skills.

Because Schneider and Pfizer have carried their burden of articulating legitimate, non-discriminatory reasons for hiring Schorgl rather than Dupont–Lauren, she must come forward with substantial evidence demonstrating that the companies' non-discriminatory reasons are pretextual and that an unlawful discriminatory intent motivated their actions. *See Travis,* 122 F.3d at 263. Dupont–Lauren, however, has failed to do so.

There is no evidence that Schneider and Pfizer's stated reasons did not actually motivate them in promoting Schorgl rather than Dupont–Lauren. Furthermore, Dupont–Lauren has not adduced evidence that creates a reasonable inference that her gender was a determinative factor in the employment decision. Instead, she rests her case on conclusory allegations and statements of her own subjective beliefs. These are insufficient to sustain her burden under *St. Mary's Honor Ctr.* Accordingly, Dupont–Lauren cannot prevail on her failure to promote claim.

b. *Disparities in Apportionment of Stent Sites and Sales Personnel*

Dupont–Lauren also alleges that she suffered discriminatory treatment in Schneider's assignment of stent sites and the apportionment of senior sales representatives to her region.

■ The anti-discrimination provision of Title VII prohibits adverse employment actions based on an employee's protected status. *See* 42 U.S.C. § 2000e–2. Adverse employment actions under this provision include discharges, demotions, refusals to hire, refusals to promote, and reprimands. *See Kocsis v. Multi–Care Management, Inc.,* 97 F.3d 876, 885 (6th Cir.1996) (reassignment to different division not adverse employment action); *Yates v. Avco Corp.,* 819 F.2d 630, 638 (6th Cir.1987); *Lulac Councils 4433 & 4436 v. City of Galveston,* 979 F.Supp. 514, 518 (S.D.Tex.1997). With respect to the definition of an "adverse employment action," the Seventh Circuit has explained:

A material adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.

*Crady v. Liberty Nat'l Bank & Trust Co.,* 993 F.2d 132, 136 (7th Cir.1993) (no adverse

action where job transfer merely caused personal inconvenience or altered job responsibilities); *see Harlston v. McDonnell Douglas Corp.*, 37 F.3d 379, 382 (8th Cir.1994) (reassignment to a different position without any reduction in title, salary, or benefits was not adverse employment action although new position involved different duties and was more stressful); *Flaherty v. Gas Research Institute*, 31 F.3d 451, 457 (7th Cir.1994) (semantic change in title and "bruised ego" did not constitute adverse employment action where pay, benefits, and level of responsibility remained the same); *Spring v. Sheboygan Area Sch. Dist.*, 865 F.2d 883, 885 (7th Cir. 1989) (transfer to a dual principalship over two schools with higher pay was not an adverse employment action); *Page v. Bolger*, 645 F.2d 227, 233 (4th Cir.), *cert. denied*, 454 U.S. 892, 102 S.Ct. 388, 70 L.Ed.2d 206 (1981) (process used in selecting board members that evaluated plaintiff's qualifications for promotion did not involve an adverse employment action).

■ In the present case, Dupont–Lauren's complaints about the apportionment of stent sites and senior sales representatives do not involve adverse employment actions for which the anti-discrimination provision of Title VII provides relief. Specifically, she alleges that only one senior sales representative worked in her region, while male regional sales managers had two senior representatives. With respect to the stent sites, regions managed by men received three sites, a region managed by a woman received two, and Dupont–Lauren's region received one. Such *de minimis* occurrences do not constitute adverse employment actions, as they effected no material change in Dupont–Lauren's terms or conditions of employment. At best, these apportionments might have had a tangential effect on the level of sales in her region, which was one factor used to determine her compensation. Dupont–Lauren has presented no evidence, however, that these assignments in fact resulted in decreased compensation. Rather, Dupont–Lauren stated at her deposition that her level of monetary compensation actually increased despite the fact that her region had one less senior sales representative and

two less stent sites than those regions headed by male managers.

■ Further, even if the actions surrounding these conditions constituted adverse employment actions, Schneider has set forth adequate, non-discriminatory reasons for their existence. With respect to the stent sites, Schneider adduced evidence that they were selected according to the merits of the participating hospitals and not on the basis of the regional managers' gender. Among the factors considered were: (1) the need for the site to follow the mandated protocols; (2) the ability of the site to generate publicity for the device; (3) amenability of the hospital to a contract provision designating Minnesota as the forum for any litigation connected with the device; (4) whether the hospital was undergoing investigation by the government for billing improprieties; (5) geographic proximity to the other sites; and (6) the opinions of the committee members.

Similarly, Dupont–Lauren's testimony confirmed that the number of senior sales representatives in a particular region was dependent upon several factors, including a prerequisite of three years employment as a sales representative, attainment of sales forecasts for two out of three years, and a recommendation by the regional sales manager. Schneider also contends that Dupont–Lauren had fewer senior representatives because her abrasive personality led the sales representatives assigned to her region to seek other employment. Schneider further explained that senior sales representatives were not required to move to another region in order to create parity. Moreover, Schneider increased Dupont–Lauren's compensation to correct any inequalities in compensation that disparities in the distribution of senior sales representatives caused.

Finally, Dupont–Lauren has failed to set forth sufficient evidence demonstrating that Pfizer and Schneider's non-discriminatory reasons are pretextual and that a discriminatory intent motivated their actions. Instead, Dupont–Lauren admitted in her response to interrogatories that she had fewer senior representatives "due to the newness of the representatives" that she managed. With respect to the stent sites, Dupont–Lauren

does not dispute that Schneider and Pfizer considered their stated criteria. Instead, she makes the bald assertion that a desire to discriminate against her, based on her sex, was their true motivating factor. She has not, however, provided information as to the sites that were actually selected by the companies, demonstrated that any of the selected sites did not meet the stated qualifications, or pointed out any sites in her region that met the criteria but were rejected. Thus, Dupont–Lauren has failed to carry her summary judgment burden and cannot prevail on her claims alleging disparities in the apportionment of stent sites and sales personnel.

## C. *Retaliation under Title VII*

Dupont–Lauren further asserts that she was retaliated against for complaining to Gillick about the perceived discriminatory assignment of stent sites. Specifically, she alleges that Schneider and Pfizer, through their employees and managers, subjected her to unwarranted discipline, failed to give her awards, required her to give a presentation at a meeting, temporarily revoked their permission for her to relocate, shunned her, and surreptitiously contacted her sales representatives and the hospitals that she serviced.

Title VII prohibits retaliation against an employee who has engaged in activity protected by the Act:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e–3.

[25–28] To establish a *prima facie* case of retaliation, a plaintiff must show:

(1) the plaintiff participated in statutorily protected activity;

(2) an adverse employment action occurred; and

(3) a causal connection exists between the protected activity and the adverse action.

*See Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 707 (5th Cir.), *cert. denied*, —— U.S. ——, 118 S.Ct. 336, 139 L.Ed.2d 260 (1997); *Grimes*, 102 F.3d at 140; *Long v. Eastfield College*, 88 F.3d 300, 304 (5th Cir.1996); *Dollis*, 77 F.3d at 781; *see also Mayberry*, 55 F.3d 1086 at 1092; *Ray*, 63 F.3d at 435 n. 22; *Pierce v. Texas Dep't of Criminal Justice*, 37 F.3d 1146, 1151 (5th Cir.1994), *cert. denied*, 514 U.S. 1107, 115 S.Ct. 1957, 131 L.Ed.2d 849 (1995); *Barrow v. New Orleans S.S. Ass'n*, 10 F.3d 292, 298 (5th Cir.1994); *Shirley v. Chrysler First, Inc.*, 970 F.2d 39, 42 (5th Cir.1992). "An employee has engaged in activity protected by Title VII if she has either (1) 'opposed any practice made an unlawful employment practice' by Title VII or (2) 'made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing' under Title VII." *Grimes*, 102 F.3d at 140 (citing 42 U.S.C. § 2000e–3(a); *Long*, 88 F.3d at 304). "The opposition clause of § 2000e–3(a) requires the employee to demonstrate that she had at least a 'reasonable belief' that the practices she opposed were unlawful." *Long*, 88 F.3d at 304 (citing *Payne v. McLemore's Wholesale & Retail Stores*, 654 F.2d 1130, 1140 (5th Cir.1981), *cert. denied*, 455 U.S. 1000, 102 S.Ct. 1630, 71 L.Ed.2d 866 (1982)); *see De Anda v. St. Joseph Hosp.*, 671 F.2d 850, 853 n. 2 (5th Cir.1982). In addition, the employee must demonstrate that her opposition to perceived unlawful activity was a motivating or determining factor in the adverse employment action taken by her employer, *i.e.*, there must be a causal connection. *See Jack v. Texaco Research Ctr.*, 743 F.2d 1129, 1131 (5th Cir.1984); *McMillan v. Rust College, Inc.*, 710 F.2d 1112, 1116 (5th Cir.1983). Although this element is similar to the ultimate issue in an unlawful retaliation case, the standard for establishing the causal link in a *prima facie* case is much less stringent. *See Long*, 88 F.3d at 304 n. 4; *Ray*, 63 F.3d at 435; *McMillan*, 710 F.2d at 1116–17; *Payne*, 654 F.2d at 1141 n. 13. A plaintiff need not prove that her protected activity was the sole factor in motivating the employer's challenged decision in order to establish the causal link element. *See Long*, 88 F.3d at 304 n. 5; *DeAnda*, 671 F.2d at 857 n. 12.

The Fifth Circuit has held that "the burden-shifting structure applicable to Title VII disparate treatment cases, as set forth in *McDonnell Douglas Corp. v. Green*, ... is also applicable to Title VII unlawful retaliation cases." *Long*, 88 F.3d at 304 (citing *McMillan*, 710 F.2d at 1116). Therefore, after the plaintiff establishes a *prima facie* case of retaliation, the burden shifts to the defendant to proffer a legitimate, non-retaliatory reason for its actions. *See id.* at 304-05; *Shirley*, 970 F.2d at 42 (citing *EEOC v. J.M. Huber Corp.*, 927 F.2d 1322, 1326 (5th Cir. 1991)). If the employer meets its burden, the employee then bears the ultimate burden of showing that the reasons given by the employer are a pretext for retaliation. *See Shirley*, 970 F.2d at 42. "If the defendant introduces evidence which, if true, would permit the conclusion that the adverse employment action was nondiscriminatory, the focus shifts to the ultimate question of whether the defendant unlawfully retaliated against the plaintiff." *Long*, 88 F.3d at 305. In the context of a motion for summary judgment, "a jury issue will be presented and a plaintiff can avoid summary judgment ... if the evidence taken as a whole (1) creates a fact issue as to whether each of the employer's stated reasons was what actually motivated the employer and (2) creates a reasonable inference that [retaliation] was a determinative factor in the actions of which plaintiff complains." *Rhodes*, 75 F.3d at 994.

### 1. *Prima Facie Case*
#### a. *Protected Activity*

█ In this case, Dupont–Lauren premises her retaliation claim on the statements that she made to Gillick on September 20, 1994. Her deposition testimony, however, indicates that she never lodged a complaint of discrimination with the management of Schneider or Pfizer.

A: I did not raise a complaint of discrimination with Mr. Gillick.

Q: Did you not say to Mr. Gillick that there were inequities in how—based on how these stent sites were allocated?

A: I told him that it was hard being a female in the company, but don't worry because I'm documenting it.

Q: Okay. But that was a complaint of being discriminated against, wasn't it?

A: I did not use the word discrimination. He construed it as that.

Q: Are you saying now that that was not a complaint about discrimination?

A: If I had a complaint of discrimination, I would file it.

As noted above, Dupont–Lauren must demonstrate as part of her *prima facie* case that she participated in a statutorily protected activity. "An employee has engaged in activity protected by Title VII if she has either (1) 'opposed any practice made an unlawful employment practice' by Title VII or (2) 'made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing' under Title VII." *Grimes*, 102 F.3d at 140 (citing 42 U.S.C. § 2000e–3(a); *Long*, 88 F.3d at 304). For example, an employee's filing of a discrimination charge with external agencies has been recognized as a "protected activity." *See United States v. New York City Transit Auth.*, 97 F.3d 672, 677 (2d Cir.1996). Likewise, picketing an employer to protest its failure to provide employment opportunities for minorities is a protected activity. *See Payne*, 654 F.2d at 1137. Similarly, sending letters protesting unspecified "racism" and "discrimination" by an employer also constitutes protected activity. *See EEOC v. Crown Zellerbach Corp.*, 720 F.2d 1008, 1012–13 (9th Cir.1983); *Sias v. City Demonstration Agency*, 588 F.2d 692, 695–96 (9th Cir.1978). Further, making complaints to an officer of a company about discriminatory practices is a protected activity. *See Reed v. A.W. Lawrence & Co., Inc.*, 95 F.3d 1170, 1178 (2d Cir.1996); *accord Robinson v. Pinnacle Brands, Inc.*, No. 95–CV–689, 1997 WL 102478, at *8 (N.D.Tex. Feb.28, 1997); *Harker v. Utica College of Syracuse Univ.*, 885 F.Supp. 378, 385 (N.D.N.Y.1995); *Arzate v. City of Topeka*, 884 F.Supp. 1494, 1503 (D.Kan.1995). As the Second Circuit has stated:

In addition to protecting the filing of formal charges of discrimination, § 704(a)'s opposition clause protects as well informal protests of discriminatory practices, in-

cluding making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges.

*Sumner v. United States Postal Serv.*, 899 F.2d 203, 209 (2d Cir.1990) (citing *Grant v. Hazelett Strip–Casting Corp.*, 880 F.2d 1564, 1569 (2d Cir.1989)).

 Vagueness as to the nature of the grievance, however, prevents a protest from qualifying as a protected activity. *See Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 702 (3d Cir.1995); *see also Volberg v. Pataki*, 917 F.Supp. 909, 916 (N.D.N.Y.) (memorandum to state officials did not constitute protected activity), *aff'd*, 112 F.3d 507, 1996 WL 601405 (2d Cir.1996), *cert. denied*, ── U.S. ──, 117 S.Ct. 1252, 137 L.Ed.2d 333 (1997). An employee's statement cannot be deemed to be in opposition to an unlawful employment practice unless it refers to a specific practice of the employer that is allegedly unlawful. *See Crown Zellerbach Corp.*, 720 F.2d at 1013. In the present case, Dupont–Lauren testified at deposition that her statements to Gillick did not constitute a complaint of discrimination and should not be construed as such. Her purported comments were vague and failed to apprise the employer of any particular practices she viewed as discriminatory. Dupont–Lauren did not complain of any specific activity that she believed to be unlawful, nor did she accuse any specific individual of discriminating against her. Further, where an employee resists an employer's attempts to investigate discriminatory activity, "she cannot claim her informal complaints amounted to an activity protected by federal law." *Bray v. Tenax Corp.*, 905 F.Supp. 324, 328 (E.D.N.C.1995). Here, Dupont–Lauren stated at deposition that when House asked her whether she had been discriminated against, she refused to answer the question, refused to inform him of the instances in which she thought she had been subjected to discrimination, and instead gave an evasive answer about her region being the object of discrimination. Her resistance to these efforts at investigating the situation further precludes Dupont–Lauren from claiming that her statements to Gillick constituted a protected activity.

### b. *Adverse Employment Action*

Schneider and Pfizer also contend that any purported retaliatory actions are not the type of adverse employment actions addressed under Title VII's anti-retaliation provision.

 "Title VII was designed to address ultimate employment decisions, not to address every decision made by employers that arguably might have some tangential effect upon those ultimate decisions." *Dollis v. Rubin*, 77 F.3d 777, 781 (5th Cir.1995); *Page*, 645 F.2d at 233. Ultimate employment decisions include hiring, discharging, promoting, compensating, or granting leave. *See Messer*, 130 F.3d at 135; *Mattern*, 104 F.3d at 707. An ultimate employment decision, in itself or through its direct consequences, must effect a material change in the terms or conditions of employment. *See Ledergerber v. Stangler*, 122 F.3d 1142, 1144 (8th Cir. 1997). "Although actions short of termination may constitute an adverse employment action within the meaning of the statute, 'not everything that makes an employee unhappy is an actionable adverse action.' " *Manning*, 127 F.3d at 692 (quoting *Montandon v. Farmland Indus., Inc.*, 116 F.3d 355, 359 (8th Cir.1997)). Interlocutory or mediate decisions, even those that can lead to an ultimate employment decision, are not adverse employment actions for purposes of a Title VII retaliation claim. *See Mattern*, 104 F.3d at 708.

The courts have held that a wide array of employment adversities do not constitute ultimate employment decisions that are actionable under the anti-retaliation clause of Title VII. *See Messer*, 130 F.3d at 135; *Mattern*, 104 F.3d at 707. For example, an employer's failure to resolve internal grievances, close monitoring of an employee's conversations, frequent criticism of the employee's work and conduct, failure to heed an employee's input, failing to permit the employee to represent the employer at business functions, and downsizing of the employee's department do not constitute ultimate employment decisions. *See Messer*, 130 F.3d at 135; *see also Cesaro v. Lakeville Community Sch. Dist.*,

953 F.2d 252, 254 (6th Cir.), *cert. denied,* 506 U.S. 867, 113 S.Ct. 195, 121 L.Ed.2d 138 (1992) (permitting outsiders to apply for a position was not an ultimate employment decision actionable under Title VII). Similarly, denial of a desk audit which restricted opportunities for promotion, denial of attendance at a training conference, an employer's providing false information to an employee regarding aspects of an assignment, requiring that a supervisor approve every document written by an employee, and criticism of an employee's work to a vendor also do not constitute adverse employment actions. *See Dollis,* 77 F.3d at 779, 780, 782; *see also Manning v. Metropolitan Life Ins. Co.,* 127 F.3d 686, 692 (8th Cir.1997) (employer's hostility and personal animus do not constitute ultimate employment actions); *Ledergerber,* 122 F.3d at 1144 (reassignment of employee's staff resulting in loss of status and prestige was not ultimate employment decision); *Thomas v. St. Luke's Health Sys., Inc.,* 869 F.Supp. 1413, 1435 (S.D.Iowa 1994), *aff'd,* 61 F.3d 908, 1995 WL 416214 (8th Cir.1995) (employer's initial demands that employee take drug test and accept another position were not adverse employment actions).

Likewise, satisfactory but diminished evaluations do not constitute adverse employment actions giving rise to actionable retaliation claims. *See Meredith v. Beech Aircraft Corp.,* 18 F.3d 890, 896 (10th Cir.1994); *see also Speer,* 123 F.3d at 664 (poor performance evaluation alone, even if undeserved, is not an adverse action); *Smart v. Ball State Univ.,* 89 F.3d 437, 442 (7th Cir.1996); *accord Munday v. Waste Management of North Am., Inc.* 126 F.3d 239, 244 (4th Cir. 1997) (yelling at an employee during a public meeting, directing other employees to ignore her and spy on her, and generally refusing to communicate with her concerning her employment-related complaints is not actionable adverse employment action). Other activities that do not constitute adverse employment actions within the scope of the anti-retaliation provision include hostility from fellow employees, having tools stolen, visits to the employee's home, verbal threats of being fired, reprimands, a missed pay increase, and being placed on "final warning." *See Mattern,* 104 F.3d at 707–08. The Fifth

Circuit also found that no adverse employment action occurred when an office newsletter routinely ridiculed the plaintiff based on her gender and her filing of an EEOC charge alleging sexual discrimination. *See DeAngelis v. El Paso Mun. Police Officers Ass'n,* 51 F.3d 591, 597 (5th Cir.), *cert. denied,* 516 U.S. 974, 116 S.Ct. 473, 133 L.Ed.2d 403 (1995).

 In the instant case, Dupont–Lauren complains that the defendants retaliated against her by subjecting her to unwarranted discipline, failing to give her sales awards, requiring her to give a presentation at a meeting, temporarily reneging on a grant of permission to relocate, shunning her, and surreptitiously contacting her sales representatives and the hospitals that she serviced. None of these actions, however, was an ultimate employment decision or affected the terms or conditions of her employment. Notably, Dupont–Lauren has not alleged that these activities resulted in lower sales in her region, materially reduced her responsibilities, directly affected her ability to manage her region, or made her job substantially more difficult. Indeed, she admitted in her response to interrogatories that her salary increased from $118,422 in 1993, to $134,474 in 1994, and again to $158,575 in 1995. Because the alleged retaliatory acts were not ultimate employment decisions, caused no tangible changes in her duties or working conditions, and resulted in no material employment disadvantages, no adverse employment action within the scope of the anti-retaliation provision of Title VII occurred. *See Manning,* 127 F.3d at 692. "Title VII is not directed against unpleasantness per se . . . ." *Carr v. Allison Gas Turbine Div., Gen. Motors Corp.,* 32 F.3d 1007, 1009 (7th Cir. 1994). Dupont–Lauren's allegations of retaliation are based on activities which, although perhaps impolite and somewhat devious, simply do not rise to the level of actionable conduct. Accordingly, her retaliation claim fails on this ground, as well.

### 2. *Legitimate, Nonretaliatory Reason*

Schneider and Pfizer have also articulated legitimate, nonretaliatory reasons for their actions.

With regard to her below-average performance appraisal for 1994, Schneider and Pfizer adduced deposition testimony that Dupont–Lauren received such an evaluation due to numerous complaints about her style and demeanor. A cursory glance at her deposition testimony and that of her co-workers at Schneider indicates that Dupont–Lauren possesses a personality that some people find abrasive. Moreover, as to her failure to receive the 1994 regional manager of the year award, Schneider produced evidence that Dupont–Lauren did not meet the criteria for the award, a non-retaliatory reason for Schneider's action.

Dupont–Lauren admits that her failure to receive certain communications was probably an oversight, thus substantiating Schneider's non-retaliatory reasons for these omissions. In addition, Schneider and Pfizer adequately demonstrated that meeting with sales staff and clients from Dupont–Lauren's region in her absence stemmed from Dupont–Lauren's inability to maintain an amicable relationship with these parties, making her presence counterproductive. Furthermore, the evidence shows that any exclusion of Dupont–Lauren from these meetings was done with reluctance, as neither Schneider nor Pfizer benefitted from her exclusion. On the contrary, her absence entailed additional work for her superiors. Hence, Schneider and Pfizer have fulfilled their burden of articulating legitimate, non-retaliatory reasons for their actions, thus shifting the focus to the ultimate issue of retaliation.

### 3. *Pretext*

The final inquiry, therefore, is whether the proffered reasons for the alleged acts of retaliation are merely pretextual. To demonstrate a "pretext for retaliation," the plaintiff must show both that the employer's stated reasons for its actions are false and that prohibited retaliation was the real reason for the employer's decision. *See St. Mary's Honor Ctr.*, 509 U.S. at 515. In order to avoid summary judgment following a showing of a legitimate, non-retaliatory reason for a challenged employment decision, a plaintiff must create a fact issue as to whether each of the employer's stated rea-

sons actually motivated the employer and create a reasonable inference that a desire to retaliate was a determinative factor in the employment decision. *See id.* at 515–17; *Grimes*, 102 F.3d at 140–41 (citing *Rhodes*, 75 F.3d 989 at 993). Unlike a disparate treatment case, which requires only that the prohibited factor be a substantial motive for the defendant's adverse action, "[t]he ultimate determination in an unlawful retaliation case is whether the conduct protected by Title VII was a "but for" cause of the adverse employment decision." *Long*, 88 F.3d at 305 n. 4 (citing *McDaniel v. Temple Indep. Sch. Dist.*, 770 F.2d 1340, 1346 (5th Cir. 1985)); *see Ray*, 63 F.3d at 435; *Shirley*, 970 F.2d at 43; *Jack*, 743 F.2d at 1131. Hence, a plaintiff may demonstrate pretext by showing that the employer's explanation is unworthy of credence and that a retaliatory motive more likely motivated the employer, *i.e.*, "but for" her protected activity she would not have suffered the adverse employment action. *See Ray*, 63 F.3d at 435–36; *see also St. Mary's Honor Ctr.*, 509 U.S. at 515; *Walton*, 119 F.3d at 370; *Grimes*, 102 F.3d at 140–41; *Polanco*, 78 F.3d at 977; *Marcantel*, 37 F.3d at 200.

Here, Dupont–Lauren has made no showing that the defendants' articulated reasons for their actions are false or that retaliation was actually the motivating factor. Although she points to her favorable performance reviews in previous years, Dupont–Lauren does not demonstrate that subsequent reviews, which were critical of her personality and managerial skills, were unfounded. On the contrary, she admitted that she had some personality conflicts with clients and her own sales staff. Under these circumstances, prior favorable reviews are not sufficient to create a genuine issue of material fact for trial. *See Steele*, 962 F.Supp. at 976.

In addition, while Dupont–Lauren focuses on her excellence in sales, Schneider and Pfizer concede that Dupont–Lauren's sales figures were exemplary, but have shown her interpersonal skills to be lacking. On the whole, Dupont–Lauren was treated in the same fashion as her colleagues; she merely required extra attention due to her personali-

ty and the nature of her relationships with the sales staff and clients. Specifically, all regional managers were subject to the same criteria for the granting of awards, and other regional managers were required to give presentations at the sales meeting in New Orleans. She was held to the same standards and expectations as her male and female colleagues. This equality of treatment is strong evidence that Schneider's actions were non-retaliatory. *See Penny v. United Parcel Serv.*, 128 F.3d 408, 417 (6th Cir. 1997); *McKenzie v. Illinois Dep't of Transp.*, 92 F.3d 473, 484 (7th Cir.1996); *Henry v. Guest Serv., Inc.*, 902 F.Supp. 245, 252 (D.D.C.1995), *aff'd*, 98 F.3d 646, 1996 WL 560362 (D.C.Cir.1996). Thus, Dupont–Lauren has not demonstrated that the legitimate, non-retaliatory reasons set forth by Schneider and Pfizer are a mere pretext for retaliation or that "but for" her allegedly protected activity she would not have suffered these purportedly adverse employment actions.

### D. *Title VII Sexual Harassment*

Although she does not specifically allege sexual harassment in her complaint, Dupont–Lauren's answers to interrogatories dated July 16, 1996, contain such an allegation. She states that on three occasions House told her, "It is not how good you are Randi, but who you know and how you react to them," which she construed as being a form of sexual harassment.

As noted above, Title VII makes it illegal for an employer to discriminate against an employee because of her gender. *See* 42 U.S.C. § 2000e–2(a)(1). Two principal theories of sexual harassment are cognizable under Title VII—hostile work environment and *quid pro quo. See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). A cause of action for hostile work environment requires the existence of severe or pervasive and unwelcome verbal or physical harassment of the plaintiff due to the plaintiff's membership in a protected class. *See Vinson*, 477 U.S. at 66–67; *Sischo–Nownejad v. Merced Community College Dist.*, 934 F.2d 1104, 1109 (9th Cir. 1991); *Young v. Will County Dep't of Pub.*

*Aid*, 882 F.2d 290, 294 (7th Cir.1989); *Jones*, 793 F.2d at 719–20.

Hostile work environment sexual harassment occurs when an employer's conduct "has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." *Vinson*, 477 U.S. at 65. The United States Supreme Court has confirmed that sexually discriminatory verbal intimidation, ridicule, and insults may be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment that violates Title VII. *See Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21–22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (citing *Vinson*, 477 U.S. at 65, 67). Whether the asserted conduct is sufficiently pervasive to create a hostile or offensive work environment must be determined from the totality of the circumstances. *See id.* 510 U.S. at 23. In determining whether a work environment is abusive, the court should consider such factors as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* The test is an objective, rather than a subjective, one. *See DeAngelis*, 51 F.3d at 594 (citing *Harris*, 510 U.S. at 19–20).

The Fifth Circuit has set forth five elements necessary to establish a *prima facie* case of sexual harassment in the work place:

(1) the plaintiff belongs to a protected class;

(2) the plaintiff was subjected to unwelcome harassment;

(3) the harassment was based on sex;

(4) the harassment affected a term, condition, or privilege of employment; and

(5) the employer either knew or should have known of the harassment and failed to take prompt remedial action.

*See DeAngelis*, 51 F.3d at 593; *Nash v. Electrospace Sys., Inc.*, 9 F.3d 401, 403 (5th Cir.1993); *Cortes*, 977 F.2d at 198–99; *Waltman*, 875 F.2d at 477; *Dornhecker v. Malibu*

*Grand Prix Corp.,* 828 F.2d 307, 309 n. 3 (5th Cir.1987); *Jones,* 793 F.2d at 719–20.

 In this instance, Dupont–Lauren satisfies the first prong of a *prima facie* case by virtue of her gender. As to the second and third prongs, however, House's comment is neither harassing nor of a sexual nature. Viewed objectively, the statement is not demeaning, insulting, or suggestive of anything sexual. It merely underscores the importance of making contacts to succeed in the medical device business. Further, House confirmed in his deposition that he did not understand the comment to be related to sex, and he never intended it to be understood in a sexual sense. Rather, he intended the remark to convey the idea that Dupont–Lauren needed to work on her interpersonal skills in order to increase her effectiveness as a manager. In light of other deposition testimony, including Dupont–Lauren's, it appears that this was a genuine concern of Schneider's and that her superiors attempted to convey this notion to Dupont–Lauren in a number of ways on several different occasions. Hence, the evidence reflects that the statement was made not because of her gender but to highlight Dupont–Lauren's need to improve her interpersonal skills both with her customers and her subordinates. Thus, House's comment cannot be considered sexually harassing in nature.

 Dupont–Lauren has also failed to satisfy the fourth prong of a *prima facie* case for sexual harassment, as the alleged harassment did not affect a term, condition, or privilege of her employment. As she admits, the three occasions on which this statement was purportedly made are the only instances of alleged sexual harassment that she can recount. This brief remark uttered just three times cannot be viewed as pervasive. Furthermore, as noted above, Dupont–Lauren never suffered a cognizable adverse employment action. As to the fifth prong, an employee can show actual notice by proving that she complained about the perceived harassment to higher management. *See Waltman,* 875 F.2d at 478. Dupont–Lauren, however, has not established or even alleged that she informed management officials at Schneider or Pfizer that she viewed this com-

ment as sexual harassment prior to July 16, 1996. Thus, there is no evidence that Schneider or Pfizer knew or should have known about the harassment and failed to take prompt remedial action to alleviate it, as is necessary to hold an employer liable for hostile environment sexual harassment under Title VII. *See Garcia v. Elf Atochem N. Am.,* 28 F.3d 446, 451 (5th Cir.1994); *Nash,* 9 F.3d at 404 (citing *Jones,* 793 F.2d at 720). Therefore, Dupont–Lauren's belated claim of sexual harassment must be rejected.

### III. *Conclusion*

Accordingly, Defendants Schneider and Pfizer's Motion for Summary Judgment is granted. There are no outstanding issues of material fact, and Schneider and Pfizer are entitled to judgment as a matter of law. As a consequence, Pfizer's Motion for Judgment on the Pleadings, or in the Alternative, Motion for Summary Judgment is moot.

IT IS SO ORDERED.